Filed 5/17/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MICHAEL MAZIK, | B281372 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC544968) |
| v. | |
| GEICO GENERAL INSURANCE COMPANY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Richard E. Rico, Judge.  Affirmed.

Sheppard, Mullin, Richter & Hampton, John T. Brooks and Karin Dougan Vogel for Defendant and Appellant.

Pine Tillett Pine, Norman Pine, Chaya M. Citrin; Alder Law, Michael Alder, Lauri L. Brenner; and Michael H. Silvers for Plaintiff and Respondent.

———————————————

GEICO General Insurance Company (GEICO) appeals from a judgment against it awarding punitive damages to respondent Michael Mazik for GEICO's bad faith breach of an insurance contract. A jury concluded that GEICO unreasonably delayed paying its policyholder Mazik the policy limits of $50,000 on an underinsured motorist policy after Mazik was injured in a serious automobile accident. The jury awarded compensatory damages of $313,508 and punitive damages in the amount of $4 million. The trial court subsequently reduced the punitive damages to $1 million.

GEICO appeals only the punitive damages award. It argues that (1) the evidence is insufficient to show that any "officer, director, or managing agent" was involved in any act of bad faith (Civ. Code, § 3294, subd. (b));[1] (2) even if a managing agent was involved, the evidence is insufficient to show that such an agent personally engaged in "oppression, fraud, or malice," or authorized or ratified such conduct by other employees, as required to support a punitive damages award (*ibid.*); and (3) the punitive damages award was excessive, even as reduced by the trial court.

We reject GEICO's arguments and affirm. There is sufficient evidence in the record to show that GEICO's managing agent ratified conduct warranting punitive damages. In concluding that Mazik's claim was worth far less than the policy limits, GEICO disregarded information provided by Mazik showing that he had a permanent, painful injury, and instead

_____

[1] Subsequent undesignated statutory references are to the Civil Code.

2

selectively relied on portions of medical records that supported GEICO's position that Mazik had fully recovered.  As reduced by the trial court, the $1 million in punitive damages (approximately three times the amount of compensatory damages) is within the constitutionally permitted range in view of the degree of reprehensibility of GEICO's conduct.

## BACKGROUND

### 1.    Mazik's Accident and Treatment

On August 11, 2008, Mazik was involved in a serious automobile accident on a highway in Riverside County.  While driving about 45 to 50 miles per hour, he collided head-on with another car that was in his lane driving about the same speed.  The other driver, who had crossed over double yellow lines in his attempt to pass slower traffic, was killed.

Mazik received initial treatment at the Riverside County Regional Medical Center.  Along with lacerations and abrasions, he was diagnosed with a "[g]rossly comminuted fracture of the left calcaneus," i.e., heel bone.

Mazik sought subsequent treatment at the Idyllwild Health Center and from Dr. Barry Grames with the San Bernardino Medical Orthopedics Group.  He also received physical therapy.

Dr. Grames confirmed the diagnosis of a severely comminuted fracture to the left calcaneus.  Dr. Grames treated the fracture as "nonoperative" due to the "severe soft tissue swelling and severe comminution" of the fracture.  In early December 2008, nearly eight months after the accident, Dr. Grames concluded that Mazik "may have chronic pain and discomfort and may require a subtalar fusion."  Dr. Grames saw Mazik periodically from August 20, 2008, through June 30, 2009.

Dr. Grames's final report stated that Mazik "is overall doing quite well."  However, he also reported that Mazik still had

3

pain of "3–4 on a pain scale of 1 to 10," and had "very limited range of motion of the hind foot and subtalar joint."  With respect to work status, Mazik was still "temporarily totally disabled."  Dr. Grames concluded that, if Mazik has "increasing pain or discomfort, he may be a candidate for a subtalar joint effusion in the future."

Mazik again sought medical treatment in January 2012 from Dr. Bobby Yee.  The treatment was prompted by "problems walking and working due to the pain" in his left heel.  Dr. Yee reported that Mazik had a severely restricted range of motion and arthritis in his ankle.

## 2.  Mazik's Injuries

Mazik's medical expert at trial, Dr. Jacob Tauber, described the injury to Mazik's heel as "devastating."  He explained that the "reason it hurts so much, is you not only have the deformity of the bone, but you've destroyed the joint between the ankle bone, the talus, and the heel bone, the calcaneus."  Dr. Tauber testified that he had reviewed X-rays and CAT scan records of Mazik's injury, and they showed that Mazik's bone had "literally exploded."  He testified that the severe nature of Mazik's injury was apparent from his doctors' diagnoses "right from the beginning."  He explained that the diagnosis of a "comminuted" fracture was a "fancy orthopedic word for many pieces."

Dr. Tauber further explained that surgery was not a good option for Mazik because Mazik's bone had "burst into too many pieces."  The best option was the treatment that Mazik had received, which was to splint him until the fracture healed in "whatever deformed state" and consider a fusion in the future if "you can't take the pain."  He testified it was his opinion that Mazik would "have a lifetime of chronic pain and issues related to" his heel injury.

4

### 3. Mazik's Demand

Mazik received $50,000 from Mercury Insurance Company (Mercury), the insurer for the driver of the other car who was at fault in the accident. That sum amounted to the full value of the driver's policy.

On December 31, 2009, Mazik's attorney submitted a claim to GEICO under Mazik's underinsured motorist policy, which had a policy limit of $100,000. The letter included medical records of Mazik's treatment to date along with other supporting documentation. In light of the "severity of the damages" and the residual effects of the injuries, the letter requested compensation of $50,000, representing the full policy amount offset by the $50,000 payment Mazik had already received.

### 4. GEICO's Response

After receiving Mazik's December 31, 2009 demand, a GEICO claims adjuster prepared a written "Claim Evaluation Summary" (Evaluation). The Evaluation summarized the medical records included with Mazik's demand and assessed values for medical expenses, lost income, and "pain and suffering." It calculated a "negotiation range" for the full value of the claim (including the $50,000 that Mercury had already paid) from $47,047.86 to $52,597.86. As discussed further below, Richard Burton, a GEICO claims adjuster who later worked on Mazik's file, testified at trial that the summary of the medical reports in the Evaluation omitted important information from the medical records that Mazik had provided.

After preparing the Evaluation, the adjuster obtained approval from GEICO's regional liability administrator, Lon Grothen, to reject Mazik's $50,000 claim. Accordingly, on January 22, 2010, GEICO offered Mazik a settlement of $1,000.

In September 2010, after a new claims adjuster began to work on the file but without receiving any additional information, GEICO increased its settlement offer to $13,800. Four months later, on January 22, 2011, GEICO increased its offer to $18,000. A note from Grothen approving the offer stated that he had "Increased The General Damage Range To Increase The Possibility of Settlement."

GEICO requested an independent medical evaluation of Mazik, which occurred on May 23, 2011. The examiner, Dr. Don Williams, summarized Mazik's prior medical records and then stated his brief conclusions. Dr. Williams reported that Mazik was "doing well two years after" the accident, and there was "no indication that he needs surgery." He concluded that Mazik's injury "does not restrict his occupation as a teacher" and that "[n]o further medical care is indicated." He opined that Mazik's "prognosis is good."

On February 16, 2012, GEICO served a statutory offer to compromise Mazik's claim for $18,887. Mazik rejected the offer and reasserted his demand for the policy limits.

GEICO did not make any additional settlement offers. Grothen explained that GEICO declined to do so, even though he had authorized payment of more money, because "there was no negotiation from the other side. So they never came off their policy limit. We call that throwing good money after bad. If we can't get them to negotiate, he would have been—it's bidding against yourself."

On August 31, 2012, even after GEICO had received copies of Dr. Yee's treatment records reporting continuing medical issues three years after the accident, Grothen gave his "Ok To Move This Toward Arbitration. I Do Not See This As A Policy Limits Case."

6

## 5.      The Arbitration

The arbitration took place in April 2013.  The arbitrator issued an award for the full policy limits, and GEICO provided Mazik with a check for $50,000 in June 2013, 30 months after the jury in this case concluded that GEICO should have paid the policy limits.

## 6.      Mazik's Bad Faith Action

Mazik filed this action for bad faith against GEICO on May 7, 2014.  The case was tried to a jury in July 2016.  The jury returned a verdict in favor of Mazik and awarded compensatory damages of $313,508.  The compensatory damages consisted of $300,000 for "[m]ental suffering, anxiety, and emotional distress" and $13,508 for "attorney's fees and costs to recover the insured policy benefits."

The jury also awarded punitive damages of $4 million.  Following a motion for a new trial, the trial court found that the punitive damages award was excessive in light of the ratio of punitive to compensatory damages and the fact that Mazik's claim "relates to financial damages" rather than personal injury.  The court reduced the amount of punitive damages to $1 million.

## DISCUSSION

## 1.      Standard of Review

### A.      *Oppression, fraud, or malice*

Punitive damages may be awarded only on proof by "clear and convincing evidence" that the defendant "has been guilty of oppression, fraud, or malice."  (§ 3294, subd. (a).)  A finding that the defendant engaged in such conduct is reviewed under the substantial evidence standard.  (*Kelly v. Haag* (2006) 145 Cal.App.4th 910, 916.)  In applying that standard, we "view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving

7

all conflicts in its favor." (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053.)

The parties agree that the substantial evidence standard applies to the jury's finding that punitive damages are appropriate, but differ as to how to apply that standard in light of the requirement that a plaintiff prove oppression, fraud, or malice by *clear and convincing* evidence. GEICO argues that the clear and convincing burden is "incorporated into the substantial evidence standard of review." Citing *Crail v. Blakely* (1973) 8 Cal.3d 744, 750 (*Blakely*), Mazik argues that, on appeal, the "substantial evidence standard remains the same whether the 'preponderance of the evidence' or 'clear and convincing evidence' standard applied in the trial court."

The dispute is not material. While some cases have described the appropriate inquiry as "whether the record contains 'substantial evidence to support a determination by clear and convincing evidence' " (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 891; *Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1287), the "clear and convincing evidence" component of this formulation is not of great significance on appeal. As our Supreme Court has explained, the " 'clear and convincing' " standard was adopted "for the edification and guidance of the trial court, and was not intended as a standard for appellate review." (*Blakely, supra,* 8 Cal.3d at p. 750.) The clear and convincing requirement in the trial court does not change the rule on appeal that we consider "conflicting evidence in a light favorable to the judgment, with the presumption the trier of fact drew all reasonable inferences in support of the verdict." (*Hoch v. Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48, 60.) The practical

8

effect of this rule is that the quantum, or weight, of the evidence before the jury is not a factor for appellate review.[2]

B. *Amount of punitive damages*

We review de novo whether an award of punitive damages is constitutionally excessive. (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1172 (*Simon*).)

2. **The Evidence Was Sufficient to Show That Grothen Was a "Managing Agent"**

Mazik does not contend that any of the claims adjustors who worked on his file were managing agents of GEICO. Rather, he claims that Grothen was a managing agent based upon Grothen's authority over claims exceeding $35,000. Mazik explains that his "position rests solely on the fact that Grothen had broad *regional powers* over adjusters and managers in cases up to $100,000 and used that broad discretion to enforce his 'negotiation' regime."[3] Thus, the question of whether the record

---

[2] For example, under the substantial evidence standard the testimony of one witness may be sufficient to support the verdict, even if there is other evidence that would support contrary findings. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614; *Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1245–1246.) In the context of the dispute in this case, if there was evidence sufficient for the jury to conclude that GEICO's managing agent was aware of and approved oppressive, malicious, or fraudulent conduct, we must affirm even if there was also substantial evidence that the agent was *not* aware of such conduct.

[3] GEICO argues that there is no evidence to support the claim that Grothen had settlement authority up to $100,000 and that the record supports only a conclusion that Grothen had settlement authority for claims between $35,000 and $50,000. As

9

contains substantial evidence of culpable conduct by a managing agent must be answered by evaluating Grothen's role.

Section 3294 establishes the legal standard for punitive damages. Section 3294, subdivision (a) requires proof that a "defendant has been guilty of oppression, fraud, or malice." Section 3294, subdivision (b) then describes the proof necessary when the defendant is an employer whose employee allegedly engaged in such conduct. An employer may not be liable for punitive damages based upon the acts of an employee unless the employer (1) "had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others"; or (2) "authorized or ratified the wrongful conduct for which the damages are awarded"; or (3) "was personally guilty of oppression, fraud, or malice." (*Ibid.*) And, with respect to a corporate employer, "the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." (*Ibid.*)

In *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563 (*White*), our Supreme Court explained that managing agents are employees who "exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy." (*Id.* at pp. 566–567.) The court further explained that, under section 3294, subdivision (b), a "plaintiff seeking punitive damages would have

_____

discussed below, the issue is not material, as the record shows that Grothen had substantial regional authority over a large number of claims.

10

to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business." (*White*, at p. 577.) The court disapproved two prior cases holding or suggesting that a supervisor may be a managing agent merely because he or she has the ability to hire and fire workers. (*Id.* at p. 574, fn. 4.)

GEICO argues that the court further restricted the definition of a managing agent in *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686 (*Roby*). The court in that case held that a supervisor who harassed and discriminated against an employee on account of a medical condition was not a managing agent of the defendant company. The supervisor supervised only four employees in a local distribution center for a company that had over 20,000 employees. (*Id.* at p. 714.) The court explained that, "[w]hen we spoke in *White* about persons having 'discretionary authority over . . . corporate policy' (*White, supra,* 21 Cal.4th at p. 577), we were referring to *formal* policies that affect a substantial portion of the company and that are the type likely to come to the attention of corporate leadership." (*Roby,* at pp. 714–715, italics added.)

GEICO claims that, based upon this definition, a managing agent must have responsibility over "formal" policies, which GEICO interprets as policies that are not simply "ad hoc." Thus, GEICO argues that Mazik must show substantial evidence that "Grothen established policies (i) intended to be applied across a broad scope of situations, (ii) that affected a substantial portion of GEICO, and (iii) that were likely to come to the attention of GEICO's corporate leadership."

We need not consider this claim because GEICO did not request a jury instruction containing such a definition of managing agent. Rather, Mazik and GEICO jointly requested,

11

and the trial court gave, the standard instruction on the definition of managing agent contained in CACI No. 3946. That instruction tracks the language in *White* in explaining simply that "[a]n employee is a 'managing agent' if he or she exercises substantial independent authority and judgment in his or her corporate decision making such that his or her decisions ultimately determine corporate policy." (CACI No. 3946; *White, supra,* 21 Cal.4th at pp. 566–567.) GEICO does not assert any error in this or any other jury instruction on appeal.

As the court explained in *Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, "We review the sufficiency of the evidence to support a verdict under the law stated in the instructions given, rather than under some other law on which the jury was not instructed." (*Id.* at pp. 674–675; see *Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1535 ["We therefore conclude that where a party to a civil lawsuit claims a jury verdict is not supported by the evidence, but asserts no error in the jury instructions, the adequacy of the evidence must be measured against the instructions given the jury"].) A trial court in a civil case generally "has no duty to instruct on its own motion." (*Bullock*, at p. 675.) Thus, assessing the evidence based upon a standard that was not presented to the jury or the trial court below "would allow reversal of a judgment on a jury verdict, requiring a retrial, even though neither the jury nor the court committed error." (*Ibid.*)[4]

---

[4] Pursuant to Government Code section 68081, we invited the parties to submit letter briefs addressing the issue whether GEICO forfeited the right to argue that the evidence was insufficient based upon a definition of "managing agent" that was

12

There is ample evidence in the record that Grothen met the definition of managing agent that the jury was given.[5]  Grothen had wide regional authority over the settlement of claims.  He testified that he was a regional liability administrator for Orange County, Los Angeles, San Bernardino, and Alaska.  Over 100 claims adjusters are "funneled up" to him for approval of settlements within the range of his authority, which included claims up to at least $50,000.  This responsibility affects a large

not given to the jury.  In its letter brief, GEICO argues that the definition of "formal" policy that it urges in its brief is simply the "common meaning of the term 'corporate policy' that is already embraced in the words of the instruction" included in CACI No. 3946.  But GEICO proposes a very specific definition of a formal policy that a jury would not necessarily glean from the standard instruction.  GEICO forfeited the right to argue that the evidence is insufficient to meet that specific definition by failing to request an instruction that included it.  To the extent that GEICO argues that a "formal" policy simply means something other than a decision " 'for the particular case at hand without consideration of wider application' " (i.e., its definition of "ad hoc"), as discussed below the evidence of Grothen's role was sufficient to meet that definition.

[5] It is likely that the evidence would support Grothen's status as a managing agent even under the specific definition that GEICO urges.  An employee's authority over the systematic *application* of policies in a claims manual or other formal corporate document might "determine corporate policy" as effectively as the formulation of the policies themselves.  (*White, supra,* 21 Cal.4th at pp. 566–567.)  It is doubtful that the court in *Roby* intended its reference to "formal" policies to exclude persons with such authority from its definition of a managing agent.  Nevertheless, we need not address that question here.

13

number of claims. Grothen testified that he typically has 18 to 20 meetings per day with claims adjusters seeking his approval or direction for handling particular claims.

Grothen's own testimony established that an important part of his job was to establish settlement standards within his region. He testified that it is "an extremely important part of [his] role" to "maintain consistency in settlement valuations." He further explained that "consistency is also important so we can be profitable." The jury reasonably could have concluded that this type of broad decisionmaking responsibility for establishing GEICO's settlement standards "ultimately determine[d] corporate policy." (*White, supra,* 21 Cal.4th at pp. 566–567.)

### 3. The Evidence Was Sufficient To Show That Grothen Ratified Conduct Warranting Punitive Damages

As the trial court concluded in denying GEICO's motion for judgment notwithstanding the verdict, Mazik provided evidence at trial that GEICO "deliberately 'cherry-picked' medical information and disregarded unfavorable findings." The evidence supports this conclusion.

As mentioned, Burton (the GEICO claims adjuster who testified at trial) admitted that GEICO's initial claim evaluation summary omitted important information that appeared in Mazik's medical records. The omitted information included that (1) Mazik was still on crutches and had a cast several weeks after his accident; (2) Mazik had back pain despite no history of back problems; (3) the fracture to Mazik's calcaneus (i.e., heel bone) was "severe"; (4) as of January 20, 2009, over five months after the accident, Mazik's symptoms were worse with walking and he had significant discomfort in his cast and was medicating with Vicodin and ibuprofen; (5) Mazik had limited joint motion nearly

three months after the accident; (6) Mazik's pain level had decreased by November *only* when he was not using his foot, not in general as the summary implied; and (7) as of the end of December 2008, Mazik still had current pain complaints and functional limitations and was continuing physical therapy.

GEICO's claims adjusters also prepared summaries in advance of the arbitration that were misleading and omitted significant information. A summary prepared on February 14, 2012, incorrectly stated that Mazik had not submitted any documentation in support of his request for reimbursement of expenses that Mazik's mother and a friend had incurred in assisting him after the accident. In fact, Mazik had submitted such documentation with his initial demand.

Another prearbitration summary dated June 12, 2012, noted as "strengths of case" that there had been "no medical treatment since May 2009, then went back to a Dr. Yee for 5 visits between 1/10/12 and 3/23/12. This appears to be for fitting of shoes." This summary grossly trivialized Dr. Yee's diagnosis and treatment. Dr. Yee's records showed that special shoes were not simply a convenience, but were necessary because of ongoing "problems walking and working due to the pain." They noted that Mazik has "undergone significant trauma to the left heel and foot which has resulted in a rearfoot deformity." While a New Balance shoe helped to solve this problem to a "great degree," Mazik was "still having problems due to a sensation that he is inverted." Orthotics were necessary for a "persistent sensation of falling to the outside" that "appears to be overwhelming him."

GEICO concedes that "[i]t is possible" a reasonable jury could conclude that the claims adjusters responsible for Mazik's file "intentionally disregarded" facts in the medical records when

15

preparing their summaries. However, GEICO argues that the claims adjusters' conduct cannot support a punitive damages award because Grothen himself was "not personally involved in reviewing Mazik's medical records or otherwise personally involved in investigating his claim."

We reject the argument. There was sufficient evidence for the jury to conclude that Grothen engaged in oppressive conduct by ignoring information concerning the serious and permanent nature of Mazik's injuries for the purpose of saving the company money.

First, the jury reasonably could have concluded that Grothen was aware the claims adjusters had reported only selected information. Grothen testified that because of his limited contact with individual claims, he relies on claims examiners to provide him with accurate summaries. However, he also testified that in reviewing proposed settlement offers, he has access to the entire claims file and spot checks the information the examiner provides. If he concludes that the examiner has not done a thorough job, he investigates further.

Grothen had sufficient contact with Mazik's file for the jury to find that he knew the adjusters' summaries were misleading. GEICO maintains an electronic claims diary that records all the pertinent events concerning its handling of claims. That diary reflects that Grothen provided direction and/or approval for claims decisions on numerous occasions:

(1) On January 19, 2010, Grothen gave his approval to reject Mazik's initial demand for payment of the policy limits on his claim.

(2) On January 25, 2010, Grothen instructed the claims adjuster that "We Need To Confirm What The Attorney Alleges In The Letter. He Says There Is A Permanent Limp. Ask For An

16

[independent medical examination (IME)].  Send A Wage Loss Auth So We Can Get His Records From His Employer.  Advise The Attorney We Will Re Evaluate The Claim Once This Information Is Received."

(3)     On February 22, 2011, Grothen approved an offer of up to $18,000 and directed the adjuster to "Get The [IME] Asap."  He also directed the adjuster to bring the file back to him when it is completed, stating that "We Can Re Evaluate Our Offer At That Time."

(4)     On February 14, 2012, Grothen directed a note to the claims adjuster stating that "We Met This Morning.  I Agree That This Does Not Appear To Be A Policy Limits Case.  Unless They Move Off That Demand I Would Let The Case Be Arbitrated."[6]

(5)     On March 6, 2012, Grothen directed a note to the claims adjuster stating that "We Met.  We Have A Very Positive [IME] That Indicate [*sic*] There Will Be No Restrictions In Terms Of The Insured's Employment.  There Has Been No Additional Treatment In Nearly 3 Years.  I Suggest That We Let This Go Forward.  Please Contact Defense Counsel."

(6)     On August 31, 2012, Grothen gave his approval to move the case toward arbitration, stating that "I Do Not See This As A Policy Limits Case."

---

[6] The evidence showed that Grothen signed a prearbitration summary on February 14, 2012, after discussing the summary with Burton.  Thus, GEICO's assertion that the evidence shows only that Grothen reviewed the initial Evaluation is incorrect.  Moreover, it was reasonable for the jury to infer that Grothen saw the other summaries as well.

17

(7)     On February 22, 2013, Grothen gave his authorization to let the statutory settlement offer expire.

Thus, Grothen had far more than a passing familiarity with Mazik's claim.  The jury reasonably could have concluded that Grothen understood the claims adjusters' summaries told only part of the story.

Second, the jury also could have reasonably concluded that Grothen himself was fully aware of the serious nature of Mazik's injuries.  The summaries that Grothen reviewed, although misleading, did contain information that the jury could have concluded would have alerted an experienced reviewer like Grothen to the serious nature of Mazik's injuries.  For example, the claims adjuster's initial Evaluation in January 2010 stated that Mazik had a "grossly comminuted fracture."  Grothen understood that a comminuted fracture means that the bone is "kind of split apart" and fragmented.  He admitted that it was a serious injury.  The Evaluation also mentioned that Mazik had osteoporosis, which Burton admitted was "not" "a good thing to have."

Mazik's original treating doctor, Dr. Grames, also stated in one of his reports that Mazik was likely to have chronic aching pain.  Grothen admitted that this was important information, and testified that he could not say he "didn't know it."

Burton's testimony also suggested that Grothen received more information than was included in the summaries.  Burton explained that, when meeting with a supervisor for approval of a settlement offer, claims adjusters typically expand on the information included in the summaries. For example, while the January 2010 Evaluation referred to Mazik's injury as a "left fractured foot," when meeting with a supervisor the claims

18

adjuster would expound on that description by explaining that it was a "comminuted fracture of the calcaneus."

Third, the jury could have reasonably concluded that Grothen adopted an improper adversary approach to resolving Mazik's claim. Grothen testified that he approved GEICO's settlement offer of $18,800 even though the adjuster, with Grothen's approval, had estimated a claim value of up to $23,000. Grothen explained that offering the low end of the evaluated settlement range was part of a negotiation strategy. While Grothen's explanation of this negotiating strategy concerned an offer that Grothen claimed was within the range of reasonableness, the jury reasonably could have rejected that explanation and concluded that Grothen was simply attempting to negotiate as low a payment as possible regardless of Mazik's injuries.

In explaining why GEICO did not provide Dr. Tauber's report to the independent medical examiner, Dr. Williams, Grothen also testified that GEICO was "going into an arbitration proceeding," which was an adversary process similar to Mazik's lawsuit. Although he admitted that GEICO had a duty to constantly evaluate Mazik's claim based on new information, Grothen testified it was "up to the lawyers" whether to share Dr. Tauber's report with Dr. Williams based on their legal strategy. The jury could have concluded that this adversary approach placed GEICO's interests above Mazik's and led GEICO to ignore information that supported Mazik's claim.[7]

---

[7] Mazik's bad faith expert testified, without objection, that Grothen's tactic of offering the low end of a range within which GEICO was prepared to settle was itself inconsistent with

In light of this evidence, the jury had a sufficient basis to conclude that Grothen approved unreasonably low offers to Mazik that ignored medical records showing the serious and permanent nature of his injuries. Mazik's bad faith expert evaluated Mazik's claim at $400,000 to $450,000 based only on Mazik's initial demand letter and the documentation provided in support of that demand. Dr. Tauber described Mazik's injury as "devastating" and testified that the severity of the injury was obvious from the beginning. GEICO's own claims adjuster, Burton, admitted that he understood why Mazik considered GEICO's initial $1,000 offer "insulting," and said that he would have handled it differently than the adjuster who made that offer.[8] Burton also agreed that Mazik has a deformity in his left foot and that such a permanent deformity is something that should be taken into consideration in determining compensation for pain and suffering.

Thus, the record supports the jury's conclusion that GEICO's conduct amounted to oppression or malice warranting punitive damages. Section 3294 defines "malice" as intentional injury or "despicable conduct which is carried on the defendant with a willful and conscious disregard of the rights or safety of others." (§ 3294, subd. (c)(1).) "Oppression" is "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (§ 3294, subd. (c)(2).)

---

GEICO's obligation to its insured and amounted to bad faith. He also testified that GEICO should have sent Dr. Tauber's report to Dr. Williams and that its failure to do so amounted to intentionally selecting information to defeat Mazik's claim.

[8] As discussed, this initial offer was approved by Grothen.

20

An insurer is not permitted to rely selectively on facts that support its position and ignore those facts that support a claim. Doing so may constitute bad faith. (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 721; *Maslo v. Ameriprise Auto & Home Ins.* (2014) 227 Cal.App.4th 626, 634.) When sufficiently egregious, an insurer's intentional disregard of facts supporting a claim also meets the standard for punitive damages. (*Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 821–822 (*Egan*).) Viewing the record in light of the substantial evidence standard, the jury reasonably could have found that Grothen ratified such egregious conduct in approving settlement offers that ignored Mazik's serious and permanent injuries.

4. **The Amount of Punitive Damages Is Within the Range Permitted By Due Process**

The due process clause of the Fourteenth Amendment to the United States Constitution "places constraints on state court awards of punitive damages." (*Roby, supra,* 47 Cal.4th at p. 712, citing *State Farm Mut. Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408, 416–418 (*State Farm*).) Grossly excessive or arbitrary punitive damages awards are constitutionally prohibited because " 'due process entitles a tortfeasor to " 'fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.' " ' " (*Roby*, at p. 712, quoting *Simon*, *supra*, 35 Cal.4th at p. 1171.)

Three "guideposts" govern the analysis of whether the amount of punitive damages is constitutionally permissible: " '(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and

21

the civil penalties authorized or imposed in comparable cases.' " (*Roby, supra,* 47 Cal.4th at p. 712, quoting *State Farm, supra,* 538 U.S. at p. 418.) Of these, the most important is the degree of reprehensibility of the defendant's conduct. (*Roby*, at p. 713.)

## A. *Degree of Reprehensibility*

In analyzing the reprehensibility of the defendant's conduct, we consider whether " '[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.' " (*Roby, supra,* 47 Cal.4th at p. 713, quoting *State Farm, supra,* 538 U.S. at p. 419.)

The first two factors do not apply here. As the trial court found in ordering the reduction of the punitive damages award from $4 million to $1 million, "this is a bad faith case premised on delay rather than a suit for personal injury. As such, the claim relates to financial damages."

However, the last three factors are present:

### *Financial vulnerability*

Mazik was financially vulnerable. Both he and his mother testified that GEICO's failure to pay the full $50,000 of the policy on his claim caused him financial hardship. He went into debt to pay bills, including a fee for testing that he required to obtain more time to complete the test for entrance to graduate school. The accident caused him to lose the free room and board that he previously received as part of his compensation for his employment at a space camp for children. And he had to turn down social invitations for lack of money.

22

### *Repeated Conduct*

GEICO's oppressive conduct was repeated. As discussed above, on numerous occasions Grothen either authorized unreasonably low settlement offers or approved decisions not to increase those offers. Those decisions began with the $1,000 offer to Mazik in response to his initial demand, and extended through decisions to go to arbitration rather than pay the full value of the claim. Grothen declined to pay policy limits on the claim even after receiving Dr. Tauber's report in advance of the arbitration. Grothen minimized Dr. Tauber's opinion by characterizing his reputation as "an expert that testifies in litigation."

Citing *Amerigraphics, Inc. v. Mercury Casualty Co.* (2010) 182 Cal.App.4th 1538 (*Amerigraphics*), GEICO argues that its conduct was not repeated because it concerned only one claim. In *Amerigraphics*, this court observed that the defendant insurer's conduct "could be characterized as more than a single isolated incident, as the evidence showed several discrete acts of misconduct involving Amerigraphic's claim for coverage under various policy provisions." (*Id.* at p. 1563.) However, we concluded that there was no evidence that the insurer was a " 'repeat offender' " because the "conduct at issue ultimately involved only one insured and one claim." (*Ibid.*)

In contrast, there is evidence here suggesting that GEICO's approach to Mazik's claim was not isolated. As mentioned, Grothen testified that an important part of his job was to establish consistent approaches to settlement valuations within his region. Thus, there is reason to believe from Grothen's own characterization of his responsibilities that he has adopted the same approach in other cases that he employed here of selective reliance on helpful facts and acting as an adversary rather than a fiduciary. (See *Egan, supra,* 24 Cal.3d at p. 820 [" 'The

23

obligations of good faith and fair dealing encompass qualities of decency and humanity inherent in the responsibilities of a fiduciary' "], quoting Goodman & Seaton, *Foreward: Ripe for Decision, Internal Workings and Current Concerns of the California Supreme Court* (1974) 62 Cal.L.Rev. 309, 346–347.)

Other courts have concluded that repeated bad faith actions with respect to a single insured over a long period of time enhances the reprehensibility of an insurer's conduct. (See *Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 965 (*Polisso*); *Diamond Woodworks, Inc. v. Argonaut Ins. Co.* (2003) 109 Cal.App.4th 1020, 1054–1055.) In light of the extent and duration of GEICO's bad faith conduct toward Mazik and Grothen's own description of his role in establishing settlement practices, we conclude that the same approach is appropriate here.

### *Intentional malice, trickery, or deceit rather than accident*

There is evidence that GEICO intentionally manipulated the facts to create a favorable record justifying its offers to Mazik below policy limits. As mentioned, the trial court found that GEICO " 'cherry picked' medical information and disregarded unfavorable findings." While we review the amount of punitive damages under the de novo standard, "findings of historical fact made in the trial court are still entitled to the ordinary measure of appellate deference." (*Simon, supra,* 35 Cal.4th at p. 1172.)

The trial court's assessment is supported by the evidence. Grothen acknowledged that Dr. Tauber's report prior to the arbitration suggested that Mazik was "going to have ongoing problems." For strategic reasons, GEICO did not provide that report to its own expert, Dr. Williams, on whom GEICO relied for its claim valuation. While this strategic manipulation is perhaps

24

less egregious than outright fraud, it nevertheless indicates intentional conduct rather than "mere accident." (Cf. *Nickerson v. Stonebridge Life Ins. Co.* (2016) 5 Cal.App.5th 1, 22 ["Stonebridge's practice was never to authorize peer reviewers to communicate with treating physicians, thus intentionally concealing material information from the claims' functional decision maker so as to limit the amount Stonebridge would have to pay out on its policies"].)

### B. *Disparity between the harm and the punitive damages award*

As reduced by the trial court, the punitive damages award of $1 million is approximately three times the compensatory damages the jury awarded. In *State Farm,* the Supreme Court declined to "impose a bright-line ratio which a punitive damages award cannot exceed." (*State Farm, supra,* 538 U.S. at p. 425.) However, the court cited as "instructive" the "long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish." (*Ibid.*) As Mazik points out, this court has previously approved a punitive damages award with a punitive to compensatory damages ratio of more than three-to-one even where only one of the reprehensibility factors was present. (See *Amerigraphics, supra,* 182 Cal.App.4th at pp. 1562, 1566.)

GEICO relies on our Supreme Court's decision in *Roby* in arguing that the punitive damages award here should be reduced to equal the amount of compensatory damages. In *Roby,* the court reduced a punitive damages award to equal the amount of compensatory damages. (*Roby, supra,* 47 Cal.4th at p. 719.) The court relied in particular on the "relatively low degree of reprehensibility" and the "substantial compensatory damages verdict," which "included a substantial award of noneconomic

damages." (*Ibid.*)  The court cited the suggestion of the United States Supreme Court in *State Farm* that " '[w]hen compensatory damages are substantial, then a lesser ratio, *perhaps only equal to compensatory damages,* can reach the outermost limit of the due process guarantee.' " (*Roby*, at p. 718, quoting *State Farm, supra,* 538 U.S. at p. 425, italics added by *Roby*.)

However, the reprehensibility of the conduct by the defendant's managing agent in *Roby* was significantly more limited than the conduct at issue here.  In that case, managing agents of the defendant company were involved only in a "one-time failure" to take action on a report of harassment.  (*Roby, supra,* 47 Cal.4th at pp. 715–716.)  In contrast, here, GEICO's managing agent repeatedly approved bad faith settlement offers and on numerous occasions ignored information supporting Mazik's claim.

### C.    *Comparable civil penalties*

GEICO cites Insurance Code section 790.035 in arguing that the punitive damages award here is far greater than the $10,000 penalty per act that the Legislature has established for unfair or deceptive insurance practices.  Like the courts in *Amerigraphics* and *Polisso,* we do not find this comparison particularly useful as a measure of an insurer's culpability where the conduct at issue involved repeated acts of bad faith over a lengthy period of time.  (See *Amerigraphics, supra,* 182 Cal.App.4th at p. 1566; *Polisso, supra,* 139 Cal.App.4th at p. 967.) The jury here found that GEICO delayed payment for 30 months. As discussed above, the evidence showed that GEICO's managing agent repeatedly approved unreasonable settlement decisions over that time period.

26

**D.** *Conclusion*

In light of the factors indicating significant reprehensible conduct and the three-to-one ratio of punitive to compensatory damages, we cannot say that the trial court's decision approving punitive damages of $1 million exceeds constitutional restraints. We therefore affirm the punitive damages award.

**DISPOSITION**

The judgment is affirmed. Mazik is entitled to his costs on appeal.

CERTIFIED FOR PUBLICATION.


LUI, P. J.

We concur:


CHAVEZ, J.


HOFFSTADT, J.

27