Filed 3/10/26  Carreon v. U.S. Foodservice CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| HECTOR CARREON<br><br>Plaintiff and Appellant,<br><br>v.<br><br>U.S. FOODSERVICE, INC.,<br><br>Defendant and Respondent. | B326837 consolidated with B327540, B330590<br><br>(Los Angeles County Super. Ct. No. 20STCV13066) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Thomas D, Long, Judge.  Affirmed.

Lyon Law Group, Geoffrey C. Lyon; Jade Husain, for Plaintiff and Appellant.

Davis Wright Tremane, Tritia M. Murata, Frances J. Choi and James R. Sigel; Seyfarth Shaw, Jonathan L. Brophy, for Defendant and Respondent U.S. Foodservice, Inc.

U.S. Foodservice, Inc. (US Foods) terminated Hector Carreon from his job as an order selector after he and another employee were involved in a physical altercation in the frozen foods warehouse. US Foods characterized the incident, which was captured on surveillance video, as workplace violence prohibited by company policies. Carreon characterized it as a sexual assault of which he was the victim, and claimed it was one of many such incidents that US Foods knew about but did nothing to prevent.

Carreon filed a complaint asserting ten causes of action against US Foods, including sexual harassment, failure to prevent sexual harassment, discrimination, retaliation, wrongful termination, and several intentional tort claims. The trial court granted US Foods's motion for summary adjudication of all but two claims: sexual harassment and failure to prevent sexual harassment. After trial, a jury returned a verdict in favor of Carreon on both causes of action and awarded him $200,000 for past and future emotional damages. The jury also awarded Carreon $1 million in punitive damages.

US Foods moved for a new trial on several bases, including instructional error regarding the effect of a release of claims Carreon signed prior to the incident. US Foods also moved for judgment notwithstanding the verdict (JNOV) on several issues including punitive damages, which it contended were unsupported by the evidence. The trial court denied the motion for new trial but partially granted the motion for JNOV and struck the punitive damages award. Carreon subsequently sought to recover approximately $1.3 million in attorney fees. The trial court granted the motion in part, awarding him approximately $350,000 in fees.

In these consolidated appeals and cross-appeals, Carreon and US Foods challenge various rulings by the trial court. Carreon contends the trial court erred by granting summary adjudication of the bulk of his claims. He also contends the trial court erred by striking the punitive damages award and limiting his recovery of attorney fees. For its part, US Foods contends the trial court erroneously instructed the jury that it could find US Foods liable for claims covered by Carreon's release, and the attorney fee award should be reversed along with the judgment. It further contends that if the punitive damages award is reinstated, it is constitutionally excessive and should be reduced.

We affirm in full. We find no error in the court's summary adjudication of Carreon's claims, its jury instructions, or its conclusion that the punitive damages award was unsupported by substantial evidence. We also find no abuse of discretion in its attorney fee award.

## FACTUAL BACKGROUND[1]

US Foods hired Carreon to work as an order selector in the dry goods department of its La Mirada distribution facility on July 18, 2018. In December 2018, Carreon signed an acknowledgement that he received US Foods's "Memo Packet 2019," which contained copies of numerous US Foods policies. The Memo Packet included the "Workplace Violence Prevention" policy, which stated that US Foods "will not tolerate any actions, statements or other behavior by anyone that is, or is intended to be, violent, threatening, intimidating, disruptive, aggressive or harassing, as determined by the Company in its sole discretion. This means the Company will take appropriate action, up to and

---

[1] We provide a brief overview of the most salient facts here, and provide more detail as necessary in the Discussion section.

3

including termination of employment, in response to such conduct." The Memo Packet also included a zero-tolerance policy against "harassment of any kind," including "[s]exual harassment" that "creat[es] an environment that is intimidating, hostile or offensive," "derogatory or otherwise inappropriate remarks," and "unwanted physical contact."

In June 2019, US Foods transferred Carreon from the dry goods department to the freezer department. Soon after the transfer, US Foods terminated Carreon for violating its policy against dishonesty. US Foods reinstated Carreon in July 2019, after Carreon successfully grieved the matter through his union. As part of his reinstatement, Carreon signed a settlement agreement and release, the "last chance agreement," on July 25, 2019. The last chance agreement contained a provision releasing US Foods, its employees, and agents from liability for all waivable employment-related claims accruing before it was signed, including those arising under the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) (FEHA). The last chance agreement also provided that if Carreon had "another issue with any type of violation of our company work rules" during the next six months, he "shall be terminated and . . . his termination shall be final unless it is shown through the grievance process that no violation of any type occurred. No other mitigating factors and no mitigation of the penalty shall be considered."

The incident that led to Carreon's final termination and this litigation happened on August 29, 2019, roughly one month after Carreon's reinstatement. As captured on silent surveillance footage, Carreon and another order selector, Jesus Torres, approached each other on loaded pallet jacks in aisle 73 of the

4

frozen foods warehouse just before 11:00 p.m.  Both were fully clad in insulated jumpsuits.  Torres steered his pallet jack in front of Carreon's, blocking his path, and the two men exchanged words and gestured at one another.  Torres then stepped off his jack and approached Carreon, who remained on his jack.  Torres and Carreon exchanged more words and gestures before  Torres, who is larger than Carreon, pulled Carreon off his jack and threw him backward onto a shelf of boxes. As Carreon lay on his back and kicked his legs, Torres climbed onto the boxes, straddled Carreon, and repeatedly thrust his hips and groin on or near Carreon's face.  Two other workers stood nearby and watched the incident; at least one of them appeared to be filming it on his cellphone.

After about 15 seconds, Torres got up, pulled Carreon to his feet, and pushed him in the chest with one hand.  Torres then turned and began walking away.  Carreon followed him, saying something to him. Torres returned to his pallet jack, but Carreon unplugged it.  Torres stepped away, and Carreon continued to follow him, backing Torres into the warehouse shelves.  Torres then pushed Carreon in the chest with two hands before returning to his pallet jack a second time.  Carreon continued speaking to Torres, who stepped off the jack and spoke back to Carreon. Carreon stood in front of Torres's pallet jack as he got on and off it a third time.  While standing in front of Torres's jack, the men exchanged words and gestured at one another with their hands. Torres then used both hands to shove Carreon across the aisle.  Carreon immediately walked back over to Torres, speaking, gesturing, and walking in front of Torres's jack as Torres started driving up the aisle. Torres got off the jack again. He and Carreon appeared to have a verbal and possibly physical

interaction; they were obscured by another worker and his pallet jack. Torres then loaded a box onto his pallet jack as Carreon walked around the other side, still talking to Torres. Carreon retrieved his headset from the shelves, and Torres and the others left the scene on their jacks. Carreon subsequently returned to work and completed his shift.

Night warehouse manager Enrique Ramirez and his supervisor, day manager Richard Starke, watched surveillance video of the incident the following morning, August 30, 2019. Starke shared the video with two higher-ranking managers, Hugo Jimenez, the Vice President of Operations, and Adrian Amaro, the Director of Operations. They all concluded it depicted an incident of workplace violence, and "[t]he decision was made" to suspend both Carreon and Torres pending investigation. Starke notified Carreon of the decision by phone.

On September 5, 2019, Carreon filed a grievance form challenging the suspension through his union representative, Adam Methus. Methus, Carreon, and Torres all attended a meeting about the grievance on September 12, 2019. Ramirez, Starke, Jimenez, Amaro, and Human Resources Business Partner Richard Padilla attended on behalf of US Foods. During the meeting, Methus asserted that Carreon and Torres had been "horseplaying" during the incident. US Foods concluded that Carreon and Torres had violated its zero-tolerance policy against workplace violence and terminated both of them.

Carreon subsequently filed a worker's compensation claim for injuries he sustained during the incident, to his "left elbow head stress and psyche [*sic*]." He ultimately settled that claim for $30,000.

## PROCEDURAL HISTORY

In an unlimited civil complaint filed April 2, 2020, Carreon asserted ten causes of action against US Foods[2]: (1) harassment based on sex/gender (Gov. Code, § 12940, subd. (j)); (2) discrimination based on sex/gender (Gov. Code, § 12940, subd. (a)); (3) retaliation for opposing violations of FEHA (Gov. Code, § 12940, subd. (h)); (4) failure to prevent and stop harassment, discrimination, and retaliation (Gov. Code, § 12940, subds. (j), (k)); (5) assault; (6) sexual battery (Civ. Code, § 1708.5); (7) intentional infliction of emotional distress (IIED); (8) battery; (9) whistleblower retaliation (Lab. Code, §§ 1102.5, 1102.6)); and (10) wrongful termination in violation of public policies. Carreon sought statutory, compensatory, and punitive damages, as well as injunctive relief, attorney fees, and costs.

US Foods moved for summary judgment or adjudication in May 2021. On July 27, 2021, the trial court granted the motion as to all causes of action except the first cause of action for sexual harassment and the fourth cause of action for failure to prevent sexual harassment. As discussed more fully below, the trial court found that Carreon failed to demonstrate triable issues of fact regarding the motivation for his termination and US Foods's ratification of Torres's conduct.

The first cause of action for sexual harassment and the fourth cause of action for failure to prevent sexual harassment proceeded to a two-phase jury trial in September 2022. As discussed more fully below, during the first phase, the court instructed the jury with Carreon's proposed instruction regarding

---

[2] Carreon also named Torres as a defendant, but the court dismissed the claims against him without prejudice in November 2022.

the effect of the release contained in the last chance agreement. The jury returned a special verdict in favor of Carreon, awarding him $175,000 for past emotional distress and $25,000 for future emotional distress.  In the second phase, the jury awarded Carreon $1 million in punitive damages.  The trial court entered judgment naming Carreon the prevailing party on December 2, 2022.

On December 16, 2022, US Foods filed a motion for JNOV on both substantive claims and punitive damages.  It filed materials in support of the JNOV and a motion for new trial or remittitur on December 23, 2022.  Carreon filed a motion for attorney fees and costs on January 10, 2023.  He sought $1,292,197.20 in fees, including a 2.0 multiplier, and $55,132.80 in costs.

On January 23, 2023, while all three motions were pending, Carreon filed a notice of appeal.  He stated that he was appealing from an order or judgment dated July 27, 2021, and he checked boxes indicating that he was appealing "Judgment after an order granting summary judgment motion" and "An order after judgment under Code of Civil Procedure, § 904.1(a)(2)."

The trial court heard the motions for JNOV and new trial or remittitur on February 7, 2023 and issued a written ruling on February 9, 2023.[3]  The court granted the motion for JNOV in part, with respect to the punitive damages award, and ordered

---

[3]     The trial court retained jurisdiction to resolve the motions for JNOV and for new trial after the notice of appeal was filed because such motions are considered collateral to the judgment. (See *Foggy v. Ralph F. Clark & Associates, Inc.* (1987) 192 Cal.App.3d 1204, 1211-1213.)

the judgment amended to remove the award. It denied the motion for new trial or remittitur.

On March 1, 2023, before the trial court entered the amended judgment, Carreon filed a second notice of appeal. He stated that he was appealing from a judgment or order dated February 9, 2023, and again checked boxes indicating that he was appealing "Judgment after an order granting summary judgment motion" and "An order after judgment under Code of Civil Procedure, § 904.1(a)(2)."

The court filed an amended judgment striking the punitive damages award on March 10, 2023.

US Foods filed a cross-appeal on March 22, 2023. It stated that it was appealing from orders or judgments dated February 9, 2023 and March 10, 2023. It checked boxes indicating that it was appealing "Judgment after jury trial" and "An order or judgment under Code of Civil Procedure, § 904.1(a)(3)-(13)."

On April 26, 2023, US Foods filed an opposition to the fee motion and moved to tax costs. Carreon filed his reply on May 2, 2023. The trial court heard the fee and costs motions on May 9, 2023. It awarded Carreon $346,520.16 in attorney fees and $18,668.16 in costs.

US Foods filed a notice of appeal on May 18, 2023. It stated that it was appealing from the order entered May 9, 2023, and checked the box indicating it was appealing "An order after judgment under Code of Civil Procedure, § 904.1(a)(2)." Carreon filed a cross-appeal on May 24, 2023, from the same order. He checked the same box.

We consolidated the appeals and cross-appeals.

## DISCUSSION

There are four primary issues in this proceeding: (1) the summary adjudication of the second, third, and fifth through tenth causes of action; (2) the jury instructions and findings concerning the release of claims; (3) the punitive damages award and striking thereof; and (4) attorney fees. We address each issue in turn, providing additional context as necessary.

### I. Summary Adjudication

In the first of the three appeals and cross-appeals filed, Carreon contends the trial court erred in granting summary adjudication of his claims. He argues that his claims for discrimination, retaliation, and wrongful termination should have proceeded to trial because he established prima facie cases of discrimination and retaliation, and US Foods's proffered explanation for its actions was "unworthy of credence and plainly pretextual." He further argues that his claims for assault, battery, sexual battery, and IIED should have proceeded to trial because he presented evidence from which a reasonable jury could have found that US Foods ratified ongoing workplace misconduct. We conclude that we have jurisdiction to consider these issues on appeal and the trial court properly granted summary adjudication.

#### A. Appellate Jurisdiction

US Foods argues that we lack jurisdiction to consider this appeal, both because it violates the one final judgment rule and because Carreon filed it in connection with the original judgment, which was superseded by the later-filed amended judgment. It asserts that Carreon "may pursue his separate appeal from that amended judgment," but cannot pursue his challenge to the summary adjudication ruling. Carreon replies, without citation

10

to the record or any legal authority, that the appeal is proper. "[W]e have an independent obligation in this as in every matter to confirm whether jurisdiction exists." (*California Redevelopment Association v. Matosantos* (2011) 53 Cal.4th 231, 252.) Notwithstanding the lack of appropriate argument from Carreon, we conclude that we may consider the merits of the summary adjudication appeal in the circumstances here.

Under the one final judgment rule, which is codified in Code of Civil Procedure section 904.1, a party may appeal only from the final judgment in an action. (*In re Baycol Cases I & II* (2011) 51 Cal.4th 751, 756.) Accordingly, "an order . . . granting summary adjudication of certain claims . . . is generally reviewable on appeal from the final judgment in the action." (*Jennings v. Marralle* (1994) 8 Cal.4th 121, 128.) Carreon complied with this rule by timely filing a notice of appeal after judgment was entered, and identifying the summary adjudication order as the order he sought to challenge.

US Foods does not dispute the initial propriety of the appeal, but argues that it became "ineffective" or "nonoperative" when the trial court entered an amended judgment. Even assuming that is true, however, Carreon also identified the summary adjudication order in his valid, albeit premature, appeal from the amended judgment. (See Cal. Rules of Court, rule 8.104(d).) We accordingly have jurisdiction to consider the same arguments in connection with our review of the final judgment, and therefore proceed to the merits.

## B.    Additional Background

### 1.    Allegations

In addition to his allegations about the August 29, 2019 incident, Carreon alleged in his complaint that in or around

11

August 2018, a coworker named Pablo Hernandez "tried to touch Plaintiff's genitals and made harassing remarks such as 'The men in the freezer department will fuck you because that's what happens to new guys.'" Carreon alleged that he "expressed his concerns" to Methus, Ramirez, and Starke "several times," but they "were nonplussed" and replied, "'That's what goes on here.'" He also alleged that he reported the August 29, 2019 incident to Ramirez, "who reported the incident to management." Carreon alleged that Ramirez and Starke "participated in and/or ratified the harassing, discriminatory, and unlawful termination of Mr. Carreon."

### 2. Motion for Summary Judgment or Adjudication[4]

In connection with its motion for summary judgment or adjudication (MSJ), which challenged all ten causes of action, US Foods produced evidence that Carreon, Torres, and Methus all characterized the August 29, 2019 incident as horseplay during the grievance meeting. It also produced evidence that Padilla, Jimenez, and Director of Labor Relations Jerry McInnis discussed the matter after the meeting and agreed that Carreon and Torres both violated US Foods's workplace violence policy. Jimenez then made the decision to terminate both men. Pointing to this evidence, its zero-tolerance workplace violence policy, and Carreon's last chance agreement, US Foods argued that it terminated Carreon for a legitimate, nondiscriminatory and non-

---

[4] We discuss only the causes of action on which the trial court granted summary adjudication. The trial court denied summary adjudication of the causes of action for sexual harassment and failure to prevent sexual harassment, and on the issue of punitive damages.

retaliatory reason. US Foods asserted it "had a good faith belief that Plaintiff engaged in a violent, physical confrontation with Torres," and Carreon could not demonstrate pretext.

US Foods disputed Carreon's allegation that he reported the August 29, 2019 incident to Ramirez, pointing to Carreon's deposition testimony that he did not report the incident to anyone in management. It thus contended it could not be vicariously liable for non-supervisor Torres's conduct, because there was no evidence that it knew or had reason to know about it, and, moreover, it "promptly" suspended and terminated Torres once the matter came to light. US Foods also contended that any claims based on conduct that happened prior to July 25, 2019 were barred by the release contained in the last chance agreement.

US Foods further argued that Carreon's fifth through eighth causes of action for battery, sexual battery, assault, and IIED were preempted by the Workers' Compensation Act. Specifically, it contended that it could only be liable for injuries caused by one employee against another if it ratified Torres's conduct, and it did not because it promptly suspended and terminated him.

### 3.    Opposition

Carreon opposed the MSJ. He asserted that US Foods was aware of and did nothing to prevent violent and sexual incidents in the workplace, citing his deposition testimony and subsequent declaration in support. Carreon testified that when he complained to union representative Methus about the 2018 genital-grabbing incident alleged in his complaint, and threats made by coworkers Barragan, Montes, and Eric, Methus said it was "[j]ust shit that goes on in this warehouse," and "he has told

13

them to stop, but, you know, co-workers don't stop." Carreon also told human resources coordinator Sarah Zavala about the genital-grabbing incident, and she told him to speak to his supervisor. When Carreon spoke to his supervisor, Starke, about the genital-grabbing incident, Starke replied, "Shit happens here. There's nothing I could do about it." Carreon did not know if Starke spoke to Hernandez about that incident.

Carreon testified that on another occasion in January 2019, after Carreon took time off work to serve a period of incarceration for driving with a suspended license, Starke asked him if he got "fucked in jail," and said that if he had not, "you're gonna get fucked in here." When Carreon asked Starke if Starke was going to do anything about the inappropriate behavior, Starke told him, "'We've told them before to stop that kind of shit, but they're faggots down there.'" In or around February or March 2019, Carreon testified, Torres and Barragan separately threatened to "fuck" him in the freezer when he was transferred there. Carreon testified that he complained to both Ramirez and Starke; Ramirez "ignored [his] complaints" and Starke "laughed at me and asked me, 'why haven't you been fucked in the freezer yet?'"[5] Torres again threatened to "fuck" Carreon in June 2019; Methus did not answer or return Carreon's "multiple calls" about this threat. After Torres made similar threats in or around early August 2019, Carreon complained to Ramirez, who told him he

---

[5] Carreon did not mention several of Starke's alleged statements at trial. Starke denied that Carreon ever complained to him and denied making all the statements attributed to him. Ramirez also denied that Carreon ever made any complaints to him.

would talk to Torres and Torres's father, who also worked at US Foods.  Ramirez "never followed up with" Carreon.

Carreon also proffered deposition and declaration testimony about the August 29, 2019 incident.  According to Carreon, the incident began when Torres, Barragan, and Giovanni Montes boxed him into aisle 73. Carreon told Torres to move away and pointed to the surveillance camera, but Torres "lifted him off the jack, and threw Plaintiff on his back into a pallet full of frozen boxes. Plaintiff's head slammed into the hard edge of a wooden pallet before Torres started smashing the back of Plaintiff's head repeatedly into the frozen boxes. Then Torres climbed on top of Plaintiff and thrust his crotch and body weight over and over again in Plaintiff's face, hitting Plaintiff's head repeatedly against the frozen boxes for over 20 seconds" while Barragan and Montes watched and filmed.  After Torres got up, Carreon heard him and the others bragging that they posted video of the incident to social media site Snapchat.  Carreon "demanded Torres delete the video including from Snapchat, and unplugged Torres's pallet jack so Torres would hear his demands and so Torres could not hit Plaintiff with the jack.  Because of the loud noise of the freezer cooling machines and because Torres kept his headset on to ignore Plaintiff, Plaintiff had to stand close to Torres to speak to him.  Torres forcefully shoved Plaintiff three times, including once all the way across the 8-foot-wide aisle, and refused to delete the video of Plaintiff's assault."  Carreon never touched, threatened, or restrained Torres in any way, and he reported the incident to Ramirez before the end of his shift. Ramirez told Carreon to tell the shop steward, "who had previously disregarded Plaintiff's complaints."

15

Carreon asserted that the "only physical acts USF claims Plaintiff made were allegedly pointing his finger at Torres, unplugging Torres's pallet jack, and talking to Torres for about 60-90 seconds immediately after the incident as Torres was trying to ignore Carreon." Carreon characterized his actions as "opposition to being harassed and assaulted," "not his initiating aggression or physical contact of any sort," and argued that he was "suspended in retaliation for opposing and being a victim-witness to his own harassment and battery."

Carreon also challenged the adequacy and propriety of US Foods's investigation and resolution of the incident. He asserted that US Foods's investigation consisted entirely of watching the surveillance video, and that it "never asked Jose Barragan, Giovanni Montes, Jesus Torres, or Plaintiff any questions about the assault, no witness statements were taken, nobody was asked what Plaintiff and Torres were saying or doing, nobody asked the acting night supervisor at the time of the assault any questions, nobody asked Barragan or Montes for video or audio of the assault, and nobody disciplined Barragan or Montes for violating USF's workplace violence prevention and harassment policies by failing to report the assault."

Carreon further contended the grievance meeting preceding his termination was "pretextual." In support of this contention, he cited an email Zavala sent to Padilla two days before the meeting stating, "Hector Carreon and Jesus Torres are Selectors being terminated for workplace violence. . . . We were advised that Jerry McInnes [*sic*] viewed the video footage and determined there was enough evidence to support termination. Their term checks are in . . . and they will be notified of their terminations on Thursday at a meeting with the union rep. . . ." Carreon

16

further asserted that Methus would not represent Carreon at the grievance meeting unless Carreon agreed to call the incident horseplay, and US Foods "did not ask Plaintiff a single question about the August 29, 2019, assault during the meeting." When Carreon tried to interject, he "was interrupted by a USF manager." After the meeting, Starke told Carreon he was terminated "'for an act of violence,'" even though "[n]obody alleged in the meeting that Plaintiff himself committed any act of violence."

Carreon argued that the above evidence established a triable issue as to whether US Foods ratified Torres's tortious conduct, such that his tort claims were not subject to worker's compensation exclusivity. He further argued that US Foods's knowledge of and failure to stop ongoing workplace sexual harassment demonstrated triable issues on his discrimination and retaliation claims. He characterized his conduct during the August 29, 2019 incident as opposition to sexual harassment, and, because US Foods fired him specifically for that conduct, argued that he had shown "direct evidence of discrimination and retaliation." He further contended that "[e]ven without direct evidence, discriminatory intent may be inferred where adverse employment decisions are taken within a reasonable period of time after complaints of discrimination," and asserted that "[t]he contention Plaintiff was violent is false." He reiterated that the acts he took during the incident—"allegedly pointing his finger at Torres, unplugging Torres's pallet jack, and talking to Torres for about 60-90 seconds immediately after the incident"—"were part of Carreon's opposition to being harassed and assaulted," and asserted US Foods had "no policy" against "reasonable opposition to harassment and violence." In support of his discrimination

17

claim, he argued that although some women worked in the warehouse, only men were subject to the "dry humping harassment by the other males in the warehouse, as some sort of out of control hazing." He did not make any independent arguments in support of the wrongful termination claim, which he acknowledged was derivative of the discrimination and retaliation claims.

### 4. Reply

In reply, US Foods argued that Carreon failed to offer any evidence in support of his claim that he was treated differently because of his gender. It maintained that "any US Foods' employee, regardless of their gender, would have been terminated for engaging in the same conduct that Plaintiff did during the incident with Torres." US Foods further argued that Carreon could not "establish a causal connection between his purported 'complaints' and his termination," because he "failed to present any evidence that Jimenez, the decision maker for Plaintiff's termination, was aware of any such complaints."

US Foods also argued that Jimenez had a good-faith belief that Carreon violated the workplace violence policy, and Carreon failed to demonstrate that its invocation of the policy was pretextual. In support, it pointed to the undisputed, expansive terms of its zero-tolerance workplace violence policy, including the provision stating that US Foods has "sole discretion" over what behavior constitutes workplace violence. US Foods additionally disputed Carreon's characterization of its investigation as inadequate, contended it was "not required to afford Plaintiff with an investigation or consideration before termination," and asserted that Carreon produced no evidence

18

showing the result would have been different had "a more lengthy or probing investigation" occurred.

With respect to the tort claims, US Foods reiterated its contentions that it did not ratify Torres's conduct and was not otherwise liable for his actions under a respondeat superior theory.

### 5. Ruling

Following a hearing on July 27, 2021, the trial court issued an order granting the motion for summary adjudication in part.

The court considered the second, third, ninth and tenth causes of action for discrimination, FEHA retaliation, whistleblower retaliation, and wrongful termination collectively. The court found that US Foods satisfied its initial burden of presenting evidence that it terminated Carreon for the legitimate, nondiscriminatory and non-retaliatory reason of participating in workplace violence. The court then found that the burden shifted to Carreon to present evidence that the termination was motivated at least in part by prohibited discrimination or retaliation. The court concluded that Carreon failed to carry that burden: "Plaintiff argues some women worked in the warehouse but that no women were subject to harassment as the men were. But Plaintiff does not cite evidence of that assertion. Plaintiff argues that he was not violent and that interpretation of the August 29, 2019 incident is a jury question. But even if Plaintiff's assertion is correct and he did not act violently on August 29, 2019, that is not enough to defeat summary judgment. 'To show that an employer's reason for termination is pretextual, an employee "'cannot simply show that the employer's decision was wrong or mistaken . . .'"' (*Featherstone* [v. *Southern California Permanente Medical Group*

(2017)] 10 Cal.App.5th [1150], at p. 1159 [(*Featherstone*)].) Thus, even if Defendant's determination that Plaintiff engaged in violence or horseplay was incorrect, that does not establish a disputed fact for trial. Plaintiff did not submit evidence that a reasonable factfinder could rationally find Defendant's reason for termination is 'unworthy of credence.' (*Ibid.*) And, whether or not Plaintiff complained about Torres' conduct on August 29, 2019, Plaintiff did not submit evidence that Defendant's reason for termination—workplace violence—was pretextual."

The court also considered the fifth through eighth causes of action for assault, battery, sexual battery, and IIED collectively. It concluded that because the workers' compensation system generally provides the sole and exclusive remedy for workplace injuries, including those caused by fellow employees, Carreon could not state a cause of action unless he showed that US Foods "ratifies the conduct and becomes a joint participant." The court concluded that US Foods met its initial burden of showing that it did not ratify Torres's conduct because it suspended Torres the day after the incident and later terminated him. The trial court rejected Carreon's argument that his complaints about the threats of harassment created triable issues of fact as to the assault, battery, and sexual battery claims.

### C. Legal Standards

A defendant moving for summary judgment must show "that one or more elements of the cause of action . . . cannot be established." (Code Civ. Proc., § 437c, subd. (p)(2).) The moving defendant "'bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact'"; if the defendant carries this burden of production, it "'causes a shift, and the opposing party is then subjected to a

20

burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact.'" (*LAOSD Asbestos Cases* (2023) 87 Cal.App.5th 939, 945, quoting *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, *supra*, 25 Cal.4th at p. 850.) Summary judgment is appropriate where "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)

We review an order granting summary judgment de novo, accepting as true both the facts shown by the losing party's evidence and reasonable inferences from that evidence. (*Featherstone, supra,* 10 Cal.App.5th at p. 1158.)

### D.   Analysis

#### 1.   FEHA Discrimination and Retaliation Claims

FEHA makes it unlawful for an employer "to discharge [a] person from employment . . . or to discriminate against the person . . . in terms, conditions, or privileges of employment" because of the person's sex or gender, among other protected categories." (Gov. Code, § 12940, subd. (a).) FEHA also makes it unlawful for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (Gov. Code, § 12940, subd. (h).)

21

If a plaintiff presents direct evidence of discrimination or retaliation, the defendant can avoid liability only by proving that the plaintiff would have been subject to the same adverse employment decision absent discrimination or retaliation. (*Zamora v. Security Industry Specialists, Inc.* (2021) 71 Cal.App.5th 1, 34 (*Zamora*).) "Direct evidence is evidence that proves a fact without inference or presumption." (*Id.* at p. 35.)

In most cases, however, only circumstantial evidence of discrimination or retaliation is available. In those cases, California courts use the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802-805 (*McDonnell Douglas*)). (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 214 (*Harris*) [discrimination]; *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*) [retaliation].)

Under the *McDonnell Douglas* framework, the employee bears the initial burden of setting forth a prima facie case of discrimination or retaliation. To establish a prima facie case of discrimination under FEHA, a plaintiff must provide evidence demonstrating that he or she "(1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355.) To "establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz, supra*, 36 Cal.4th at p. 1042.)

"Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action." (*Yanowitz*, *supra*, 36 Cal.4th at p. 1042.) If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation or discrimination "'drops out of the picture,' and the burden shifts back to the employee to prove intentional retaliation" or discrimination. (*Ibid.*) To meet this final burden, the plaintiff "must produce substantial responsive evidence to show that [the employer's] ostensible motive was pretextual; that is, 'that a discriminatory reason more likely motivated the employer or that the employer's explanation is unworthy of credence.'" (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433 (*King*).) The plaintiff need not prove that discriminatory or retaliatory animus was the sole motivation behind the challenged action, but "must produce evidence that, taken as a whole, permits a rational inference that intentional discrimination [or retaliation] was a substantial motivating reason for the adverse action." (*Carroll v. City and County of San Francisco* (2025) 115 Cal.App.5th 1192, 1204, citing *Harris*, *supra*, 56 Cal.4th at p. 232.)

"The stronger the employer's showing of a legitimate, nondiscriminatory reason, the stronger the plaintiff's evidence must be in order to create a reasonable inference of a discriminatory motive." (*Featherstone, supra*, 10 Cal.App.5th at p. 1159.) "While we must liberally construe plaintiff's showing and resolve any doubts about the propriety of summary judgment in plaintiff's favor, plaintiff's evidence remains subject to careful scrutiny." (*King*, *supra*, 152 Cal.App.4th at p. 433.) Plaintiff's "subjective beliefs in an employment discrimination case do not

create a genuine issue of fact," and "plaintiff's evidence must relate to the motivation of the decision makers to prove, by nonspeculative evidence, an actual causal link between prohibited motivation and termination." (*Id.* at pp. 433-434.) The causal link is crucial; a plaintiff cannot prevail by merely showing that the employer's decision was wrong or mistaken. (*Featherstone, supra,* 10 Cal.App.5th at p. 1159.)

These burdens are altered somewhat in the summary judgment context. (*Zamora, supra,* 71 Cal.App.5th at p. 32.) The employer, as the moving party, bears the initial burden of producing admissible evidence showing either (1) a deficiency in one or more elements of the employee's prima facie case, or (2) that legitimate, nondiscriminatory factors motivated the adverse employment decision at issue. (*Ibid.*) If the employer satisfies this burden, it is entitled to summary judgment or adjudication unless the plaintiff comes forward with admissible evidence that raises a triable issue of fact material to the employer's showing. (*Ibid.*) Although the ultimate burden of proof still lies with the plaintiff, at summary judgment the employer bears the burden of persuasion that there is no triable issue of material fact such that it is entitled to judgment as a matter of law. (*Ibid.*)

Here, the trial court found, and we agree, that US Foods carried its initial burden by showing that it terminated Carreon for a legitimate, nondiscriminatory, and non-retaliatory reason: violating its policy on workplace violence.[6] "[M]isconduct

---

[6] Because we conclude summary adjudication was appropriate due to the lack of evidence demonstrating that US Foods's proffered reason for terminating Carreon was pretextual, we need not address Carreon's alternative contentions regarding

24

involving threats or violence against coworkers is properly considered a legitimate, nondiscriminatory reason for terminating the employee.  An employer making this showing at summary judgment shifts the onus under the *McDonnell Douglas* framework to the employee to show the employer used this reason as a pretext for discriminatory action." (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 168.)  The burden accordingly shifted to Carreon to produce evidence showing that the reason was pretextual.

Carreon first argues that he carried that burden "because the uncontroverted video evidence shows that Carreon did not participate in violence."  He argues that his "videotaped reaction to the videotaped sexual assault is precisely the weak, implausible, inconsistent, incoherent, and contradictory explanation that an employer cannot halfheartedly offer and yet prevail as a matter of law."  The problem is that the proffered reason for the termination was not that Carreon *was* violent, it was that he *violated the policy against workplace violence*.  That policy, the contents of which are not disputed, prohibits not only behavior that is "violent," but also that which is "threatening, aggressive or harassing, as determined by the Company in its sole discretion."  Even if Carreon is correct that his behavior did not fall within that expansive and subjective definition, he has not shown that any error in invoking the policy was driven by discriminatory or retaliatory animus.  (See *Featherstone, supra,* 10 Cal.App.5th at pp. 1159-1160.)  Instead, he rests on his subjective beliefs, which are not sufficient to create a genuine issue of material fact.  (*King, supra,* 152 Cal.App.4th at p. 433.)

---

the adequacy of his prima facie discrimination and retaliation claims.

25

Carreon's cited authorities are distinguishable. In *Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 315 (*Sandell*), employer Taylor-Listug asserted at summary judgment that it terminated employee Sandell due to performance issues, including failure to achieve sales expectations, properly manage and communicate with his subordinates, and meet with customers one-on-one. Sandell, who suffered a stroke a few years prior to his termination and experienced some lasting mobility and speech impairments (see *id.* at p. 304), alleged that Taylor-Listug terminated him due to his disability and age (60) (*id.* at p. 306). He presented "evidence that places in dispute the validity of the reasons that Taylor-Listug offers for its termination of Sandell's employment," including several favorable performance reviews and data showing that although sales numbers declined industry-wide, "under Sandell's watch, Taylor-Listug's export sales increased significantly," as did its revenues. (*Id.* at p. 316.) Sandell also pointed out that the alleged complaints from his subordinates were made during the lawsuit, not during his tenure at the company; the appellate court noted that a reasonable person could therefore infer that "Taylor-Listug's decision makers did not have the kind of feedback about Sandell's performance that they now suggest was the impetus for terminating his employment." (*Id.* at p. 317.) Sandell also presented favorable testimony from a former subordinate, and his own testimony about his meetings with customers. (*Id.* at pp. 317-318.) The appellate court determined this evidence was "such that a reasonable fact finder could conclude that Taylor-Listug's proffered reasons for terminating Sandell's employment were unworthy of credence, and, based on that conclusion, infer

26

that those reasons are not the real reasons for Taylor-Listug's termination of Sandell." (*Id*. at p. 319.)

In *Kelly v. Stamps.com Inc.* (2005) 135 Cal.App.4th 1088, 1091, plaintiff Kelly alleged her employer Stamps.com Inc. terminated her because she was pregnant. At summary judgment, Stamps.com presented evidence that it fired Kelly as part of a corporate restructuring and reduction in force. (*Id*. at p. 1098.) The appellate court found that Kelly presented evidence "of a number of circumstances that cast doubt on the genuineness of defendant's explanation for her discharge," including "a record of excellence" in her job performance, her presence on a list of people who should be retained, comments by the CEO that she had "checked out," evidence that the CEO "lied to plaintiff when she asked him to explain her termination" by telling her she had not been on the retention list, and evidence that she had been replaced by a non-pregnant person. (*Id*. at pp. 1099-1100.) The court concluded that Kelly not only "presented a triable issue that the reason or reasons defendant gave for her termination were false," but also showed "pregnancy-discriminatory motive on defendant's part." (*Id*. at p. 1101.)

In both cases, the plaintiffs countered the employers' proffered legitimate reasons with ample evidence calling their veracity into question. Here, Carreon simply asserts that US Foods's proffered reason is false because he was not physically violent. This is not sufficient to demonstrate discriminatory or retaliatory animus. We are also not persuaded this case is on all fours with *Zamora, supra,* 71 Cal.App.5th 1, in which Carreon contends the court "rightfully saw through the employer's naked, talismanic assertion of a facially legitimate reason, one which a reasonable jury could discredit." There, the employer's reasons

27

for terminating disabled employee Zamora as part of a reduction in force failed to explain why two (non-disabled) individuals who ranked lower than Zamora in a competitive evaluation were retained and reassigned, and why the employer did not consider reassigning him. (*Id.* at pp. 57-58.) Zamora also presented evidence of discriminatory animus connected to Zamora's receipt of insurance payments for temporary disability, which "supports a reasonable inference that SIS management was unhappy with Zamora because he had filed a worker's compensation claim that cost the company thousands of dollars." (*Id.* at pp. 61-62.) Here, US Foods presented evidence that it terminated both Carreon and Torres as a result of the August 29, 2019 incident pursuant to its workplace violence policy; there was no discrepancy in treatment or failure to address the allegations of Carreon's complaint.

Carreon next argues that a reasonable jury could find discriminatory animus "because USF dismissed male-on-male sexual violence under a cat's paw theory." He invokes the same theory in support of retaliatory animus in his reply brief. Under the cat's paw theory, "showing that a significant participant in an employment decision exhibited discriminatory animus is enough to raise an inference that the employment decision itself was discriminatory, even absent evidence that others in the process harbored such animus." (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 551; see also *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 113-116.) Here, Carreon asserts that Starke, Ramirez, and non-US Foods employee Methus were all significant participants in the termination decision who displayed discriminatory animus by disregarding his complaints, which "should have been communicated to Jimenez," the decision maker

in Carreon's termination.  He further asserts that Starke, Ramirez, and "others" failed to properly investigate the August 29, 2019 incident and that Starke made dismissive and offensive comments.

US Foods responds that Carreon forfeited this theory by failing to advance it below.  Carreon does not address this point, with which we agree. "In a summary judgment appeal, a party is ordinarily not permitted to change her position and adopt a new and different theory." (*Olson v. La Jolla Neurological Associates* (2022) 85 Cal.App.5th 723, 739; see also *DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 676.) "[U]nless they were factually presented, fully developed and argued to the trial court, potential theories which could theoretically create 'triable issues of material fact' may not be raised or considered on appeal." (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163.)  Carreon did not rely on the cat's paw theory below in support of either the discrimination or retaliation claim, and did not raise it here with respect to the retaliation claim until his reply brief.  (See *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764 [explaining why points raised for the first time in reply ordinarily are not considered].)  We find the argument forfeited and do not address it.

Finally, with respect to the retaliation claim only, Carreon contends (and properly contended below) that he has produced direct evidence that US Foods acted with retaliatory animus.  He argues that his conduct during the August 29, 2019 incident was itself protected activity, because he was "opposing discrimination and opposing unlawful conduct."  He asserts that US Foods's citation of his conduct during the incident as the basis for

29

terminating him is therefore "a full admission of retaliation on USF's part." We disagree.

Anti-retaliation provisions protect a wide range of conduct, not merely the lodging of formal complaints. For instance, *Yanowitz* noted that writing a letter to a customer of the employer, boycotting and picketing a store, and making repeated public and private statements that the employer engaged in discriminatory practices have all been found to be protected conduct. (*Yanowitz*, *supra*, 36 Cal.4th at p. 1047 & fn. 7.) However, as recognized in one of the cases Carreon cites in support of his direct evidence argument, "Even though opposition to an unlawful employment practice is protected, such protection is not absolute. There may arise instances where the employee's conduct in protest of an unlawful employment practice so interferes with his performance of his job that it renders him ineffective in the position for which he was employed. In such a case, his conduct, or form of opposition, is not covered by § 704(a) [of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a)]." (*E.E.O.C. v. Crown Zellerbach Corp.* (9th Cir. 1983) 720 F.2d 1008, 1015, quoting *Rosser v. Laborers' International Union of North America* (5th Cir. 1980) 616 F.2d 221, 223.) Similarly, protest activities that "significantly disrupt[ ] the workplace" are not protected conduct. (*Id.* at p. 1015; see also Cal. Practice Guide: Employment Litigation § 5:1537 ["If employees go too far in their 'opposition,' they can be discharged for *misconduct*."].)

Here, Carreon's "protest activity" consisted of following Torres around the work area for several minutes, gesturing, speaking, and eventually backing him into the warehouse shelves. Carreon also repeatedly stood in front of Torres's jack, which he unplugged at one point, blocking him from leaving the

area and other employees from traversing the aisle. This extended period of disruptive and threatening physical conduct is a far cry from the letter-writing campaign and picketing in *E.E.O.C. v. Crown Zellerbach Corp.*, *supra*, 720 F.2d at pp. 1010-1011, or the single "'shouting match'" an employee had with his supervisor over a discriminatory job ad. (*Grant v. Hazelett Strip-Casting Corp.* (2d. Cir. 1989) 880 F.2d 1564, 1567-1568.)

Carreon contends it is analogous to the conduct in *Speed v. WES Health System* (E.D. Pa. 2015) 93 F.Supp.3d 351, 355 in which plaintiff Speed slapped a colleague, Garway, who inappropriately rubbed his hands on her legs after she warned him not to do so. Speed told her supervisor about the incident immediately, and he responded that if he wrote up Garway, he would also have to write up Speed for slapping him. "Plaintiff interpreted this comment to mean that [the supervisor] would not truthfully report the situation, and his write-up would not reflect that Speed feared for her safety and bodily security and acted reflexively to protect herself." (*Ibid.*) The employer ultimately concluded Garway had sexually harassed Speed and fired him, but terminated Speed as well. (*Ibid.*) Speed alleged her termination was in retaliation for the slap, as well as her previous ongoing complaints about Garway. (*Ibid.*) The employer moved to dismiss the complaint, and the trial court denied the motion. However, it did "not reach the issue of whether a physical act of self-defense can qualify as protected activity under Title VII" (*id.* at p. 364), but instead found that Speed's "two informal complaints of sexual harassment to her supervisor are the key aspects of her allegations that constitute protected activities under the statutes." (*Id.* at p. 357.) *Speed* accordingly is not of assistance to Carreon.

31

The trial court did not err in granting summary adjudication of Carreon's FEHA claims.

## 2. Retaliation for Whistleblowing

Carreon also asserted a cause of action for whistleblower retaliation under Labor Code section 1102.5. In their MSJ briefing, the parties analyzed Carreon's two retaliation causes of action collectively, under the *McDonnell Douglas* framework. The trial court did the same when it ruled on the motion in July 2021. This was a common approach at the time. (See *Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal.5th 703, 710-712 (*Lawson*).) However, in 2022, the Supreme Court expressly held in *Lawson* that that Labor Code "section 1102.6, and not *McDonnell Douglas*, supplies the applicable framework for litigating and adjudicating [Labor Code] section 1102.5 whistleblower claims." (*Lawson, supra*, at p. 712.)

As explained in *Lawson*, analysis under Labor Code section 1102.6 involves only two steps: "[f]irst, it must be 'demonstrated by a preponderance of the evidence' that the employee's protected whistleblowing was a 'contributing factor' to an adverse employment action. [Citation.] Then, once the employee has made that necessary threshold showing, the employer bears 'the burden of proof to demonstrate by clear and convincing evidence' that the alleged adverse employment action would have occurred 'for legitimate, independent reasons' even if the employee had not engaged in protected whistleblowing activities." (*Lawson, supra*, 12 Cal.5th at p. 712, quoting Lab. Code, § 1102.6.) The key differences between the *McDonnell Douglas* and *Lawson* frameworks are that *Lawson* does not require the plaintiff to prove pretext and imposes a heightened burden on the defendant to prove the legitimacy of its actions by clear and convincing

32

evidence. "Even if the employer had a genuine, nonretaliatory reason for its adverse action, the plaintiff still carries the burden assigned by statute if it is shown that the employer also had at least one retaliatory reason that was a contributing factor in the action." (*Id.* at p. 716.)

*Lawson* is controlling authority and was decided over two years before the briefs in the instant appeal were filed. Yet neither party mentioned *Lawson* in its briefing or made any argument as to whether or how it should apply to the whistleblower retaliation claim. Instead, both sides relied primarily on the inapplicable *McDonnell Douglas* framework. We afforded the parties an additional opportunity to address *Lawson* in supplemental briefing. (See Gov. Code, § 68081; *Vatalaro v. County of Sacramento* (2022) 79 Cal.App.5th 367, 383-384 (*Vatalaro*).) After considering their arguments, we conclude that Carreon forfeited any contentions of error regarding US Foods's and the trial court's application of *McDonnell Douglas* below; that we may now apply *Lawson*; and that Carreon has not shown triable issues of material fact on his whistleblower claim under the *Lawson* standard.

Relying on *Scheer v. Regents of the University of California* (2022) 76 Cal.App.5th 904, 914-915, Carreon argues that US Foods failed to meet its threshold burden below by failing to cite Labor Code section 1102.6, the trial court erred by not applying it, and we as the appellate court should not do so in the first instance. US Foods asserts, and we agree, that Carreon forfeited any claim to this effect by affirmatively maintaining in his initial appellate briefing that "The Same *McDonnell Douglas* Burden-Shifting Framework Applies to Retaliation Claims."

33

Even if he had preserved this argument, we find the approach taken in *Vatalaro, supra*, 79 Cal.App.5th 367 more appropriate in this case.  There, as here, the appellate court requested supplemental briefing on *Lawson*, which was decided while the appeal was pending and was not addressed in the parties' briefs.  (*Vatalaro*, *supra*, 79 Cal.App.5th at pp. 383-384.)  The court then applied the *Lawson* framework to the evidence presented below, which the parties and trial court had analyzed using *McDonnell Douglas*.  (*Id.* at pp. 384-386.)  We see no basis not to do the same here, where there is no indication that use of *McDonnell Douglas* prevented Carreon from asserting any argument or evidence in support of his position.  Improperly relying on unpublished case law, Carreon asserts that he "may have presented different evidence or made different arguments in [his] opposing papers" had US Foods invoked Labor Code section 1102.6 below.  However, he argues that the evidence presented below was sufficient to meet his burden, and gives no indication he actually would have done anything differently had US Foods argued that Labor Code section 1102.6 applied in its MSJ.  In short, he has not shown that the risk of prejudice warrants reversal on procedural grounds.

He also has not shown reversal is warranted under *Lawson*. Labor Code section 1102.5 protects whistleblowers, individuals who, as relevant here, "disclos[e] information . . . to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation or noncompliance."  (Lab. Code, § 1102.5, subd. (a), (b).)  The only conduct in this case potentially encompassed by that statute is the complaints Carreon made to Ramirez, Starke, Zavala, and we will assume for purposes of this appeal, Methus.  Carreon's

34

alleged opposition of Torres's harassment during the incident itself was not a disclosure to a person with authority over him; Torres and all others present during the incident were fellow order selectors on equal footing with Carreon.

To carry his initial burden under *Lawson*, *supra*, 12 Cal.5th at p. 712, Carreon must demonstrate by a preponderance of the evidence that his protected whistleblowing was a contributing factor in his termination. He has not done so. Even in his supplemental brief, he simply asserts that he engaged in protected activity when he made the complaints. There is no properly presented evidence or argument that any of the individuals to whom he complained made the decision to terminate him. Carreon attempted to assert, via the cat's paw theory, that Starke, Ramirez, and Methus played significant roles in the decision, and speculated that they "should have" communicated his complaints to Jimenez. However, as discussed above, he forfeited that argument by failing to raise it in the trial court and, in the context of retaliation, in his opening brief.

Carreon alternatively contends that his termination was temporally proximate to his complaints. Under *McDonnell Douglas*, "the temporal proximity between an employee's [protected conduct] and a subsequent termination may satisfy the causation requirement at the first step of the burden-shifting process." (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 353 [italics omitted]). We see no reason why this should not also be the case under *Lawson*. However, when temporal proximity between the protected conduct and the adverse employment action is the sole basis of an employee's prima facie case, the temporal proximity must be "very close." (*Id.* at p. 354.) Carreon's most recent complaint prior to the incident was in early

35

August, essentially a full month prior to the incident. That is not "very close." In his declaration filed in opposition to the MSJ, Carreon testified that he made a complaint to Ramirez at the end of his shift on August 29, 2019. That would arguably be "very close" to his termination less than two weeks later. However, that declaration testimony directly contradicted Carreon's deposition testimony, which was that he never told a supervisor about the incident. A party "cannot create an issue of fact by a declaration which contradicts his prior discovery responses." (*Shin v. Ahn* (2007) 42 Cal.4th 482, 500 & fn. 12.)

### 3. Wrongful Termination

In his tenth cause of action, Carreon asserted a claim of wrongful termination in violation of public policy, also known as a *Tameny* claim. (See *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167.) The parties agree, as do we, that this claim is derivative of his FEHA and Labor Code claims. (See *Zamora, supra*, 71 Cal.App.5th at p. 62.) Since we hold that the summary adjudication was properly granted as to the underlying FEHA and Labor Code claims, we hold that the trial court also properly granted summary adjudication of the common law wrongful termination claim.

### 4. Tort Claims

The trial court granted US Foods's motion for summary adjudication of Carreon's fifth through eighth causes of action for assault, battery, sexual battery, and IIED on the grounds that they were barred by the exclusive remedy provisions of the workers' compensation system. Carreon contends this was error, because there is a triable issue of fact as to whether US Foods ratified Torres's misconduct. He also contends the IIED claim should move forward even absent ratification. We disagree.

36

"As a general rule, an employee who sustains an industrial injury 'arising out of and in the course of the employment' is limited to recovery under the workers' compensation system." (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1001, quoting Labor Code, § 3600, subd. (a).) The limited exceptions to this exclusivity rule are narrowly construed. (*Soares v. City of Oakland* (1992) 9 Cal.App.4th 1822, 1830.) The exception Carreon seeks to apply allows an employee to bring an action for damages against an employer, where "the employee's injury or death is proximately caused by a willful physical assault by the employer," or the employer ratifies the assaultive misconduct of its employee. (Lab. Code, § 3602, subd. (b)(1); see also *Fretland v. County of Humboldt* (1999) 69 Cal.App.4th 1478, 1486, 1489-1490 (*Fretland*).

Carreon contends that US Foods ratified and therefore became liable for Torres's conduct under this exception because it "knew for months that Torres and others were threatening to dry-hump Plaintiff, that one grabbed his genitals, and that employees showed videos of others being dry-humped" but "did nothing to stop or prevent the attacks." See *Fretland*, *supra*, 69 Cal.App.4th at p. 1489.) However, as he recognizes in his briefing, an employer is viewed as a joint participant and ratifier of conduct when it "has been notified of acts of physical aggression by the coemployee and . . . fails to criticize, censure, terminate, suspend or otherwise sanction that employee." Carreon presented no evidence that he notified US Foods of any acts of physical aggression by Torres. (Contra *Hart v. National Mortgage & Land Co.* (1987) 189 Cal.App.3d 1420, 1424, 1430 [employee complained about coworker's sexually charged acts]; *Iverson v. Atlas Pacific Engineering* (1983) 143 Cal.App.3d 219, 222

[employee complained coworker confined him and subjected him to loud noises].) His evidence showed that he complained about Torres's threats with mixed results; Starke made inappropriate comments, while Ramirez said he would talk to Torres and Torres's father. These facts may give rise to an inference that US Foods authorized Torres's physical misconduct, but they do not create a triable issue as to ratification.

The distinction between these concepts is critical here. Authorization is forward-looking, while ratification is backward-looking. (See, e.g., Civ. Code, § 2307 [agency is created "by a precedent authorization or a subsequent ratification"]; *id.* § 2310 ["ratification can be made only in the manner that would have been necessary to confer an original authority for the act ratified"]; *Rakestraw v. Rodrigues* (1972) 8 Cal.3d 67, 73 ["the effect of a ratification is that the authority which is given to the purported agent relates back to the time when he performed the act"]). "Ratification is the voluntary election by a person to adopt in some manner as his own act which was purportedly done on his behalf by another person, the effect of which, as to some or all persons, is to treat the act as if originally authorized by him." (*Rakestraw v. Rodrigues*, *supra*, 8 Cal.3d at p. 73; see also *Fretland*, *supra*, 69 Cal.App.4th at pp. 1490-1491 [same].)

Ratification "may occur when an employer learns of misconduct and fails to discharge an agent or employee." (*C.R. v. Tenet Healthcare Corp.* (2009) 169 Cal.App.4th 1094, 1111.) Here, the evidence unambiguously showed that US Foods immediately suspended and ultimately fired Torres after it became aware of the August 29, 2019 incident. As US Foods points out, Carreon has not cited any precedent for expanding the notion of ratification to include authorization, particularly where

exceptions to exclusivity are narrowly construed.  In both *Hart v. National Mortgage & Land Co.*, *supra*, 189 Cal.App.3d at p. 1430 and *Iverson v. Atlas Pacific Engineering*, *supra*, 143 Cal.App.3d at p. 228, the plaintiffs alleged that their employers did nothing despite being apprised of the specific acts at issue.  And in *Herrick v. Quality Hotels, Inns & Resorts* (1993) 19 Cal.App.4th 1608, 1618, the evidence showed both authorization and ratification; the employer knew of prior bad behavior but also declined to fire and later promoted the perpetrator of the incident.

The federal cases Carreon cites (without page citations) do not address workers' compensation exclusivity or ratification. They also do not support his single-sentence assertion that an employer may be held liable where "a battery in the workplace is motivated by the employee's protected class."  We are likewise unpersuaded by his contention that ratification is unnecessary to support his IIED claim because that claim implicates "fundamental public policy considerations" and arose from "a hostile environment of sexually harassing behavior."  "So long as the basic conditions of compensation are otherwise satisfied [citation], and the employer's conduct neither contravenes fundamental public policy [citation] nor exceeds the risks inherent in the employment relationship [citation], an employee's emotional distress injuries are subsumed under the exclusive remedy provisions of workers' compensation." (*Livitsanos v. Superior Court* (1992) 2 Cal.4th 744, 754; see also *Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 902 [quoting *Livitsanos*]).  "The exception for conduct that 'contravenes fundamental public policy' is aimed at permitting a *Tameny* action to proceed despite the workers' compensation

39

exclusivity remedy rule." (*Miklosy v. Regents of University of California*, *supra*, 44 Cal.4th at pp. 902-903.) As discussed above, the trial court properly granted summary adjudication of Carreon's *Tameny* claim.

## II.    Jury Instructions on Pre-Release Conduct

In its cross-appeal from the amended judgment, US Foods contends the trial court erroneously and prejudicially instructed the jury that it could find US Foods liable for conduct covered by the last chance agreement. We disagree.

### A.    Additional Background

As summarized above, the last chance agreement Carreon signed on July 25, 2019 included a broadly-worded release which the parties agree "barred any claims on the basis of actions prior to July 25, 2019." The parties also agree that evidence of pre-July 25, 2019 conduct nevertheless was relevant and admissible "circumstantial evidence of the parties' states of mind after the release was signed."[7]

#### 1.    Competing Instructions

The parties disagreed on how the jury should be instructed about the pre-July 25, 2019 conduct. US Foods proposed the following special instruction:

---

[7]    US Foods backpedals in its reply brief, asserting that "the evidence was admitted only to show *US Foods'* state of mind, not Carreon's." (Italics in original.) However, it argues that, either way, "that would not forgive the court's central error in instructing the jury that the evidence could be considered for an entirely different (and improper) purpose: determining whether Carreon's work environment was objectively 'hostile, intimidating, offensive, oppressive, or abusive.'"

"You may only consider events that occurred after July 25, 2019 to decide whether Hector Carreon has met his burden of proof to establish sexual harassment.

"If you find that sexual harassment occurred after July 25, 2019, you may consider evidence before and after that date, only on the issue of whether U.S. Foods failed to take all reasonable steps to prevent sexual harassment from occurring.

"If you find that sexually harassing conduct occurred after July 25, 2019, you may only award damages based on conduct occurring after July 25, 2019."

Carreon's competing special instruction on the issue stated:

"You may only award damages for sexual harassment of Hector Carreon that occurred after July 25, 2019, if any. However, you may consider all evidence both before and after that date, on the issue of whether U.S. Foods failed to take all reasonable steps to prevent harassment from occurring, if you find that at least some harassment occurred after July 25, 2019."

During the jury instructions conference, the court remarked that the instructions did not "differ significantly" and "state the same thing . . . in different ways." The parties disagreed. Carreon argued that the first paragraph of US Foods's proposed instruction might lead the jury to disregard any evidence of pre-July 25, 2019 conduct when considering whether US Foods failed to prevent sexual harassment. US Foods responded that its instruction was "more precise," because although pre-July 25, 2019 conduct is "relevant to proving his claims for failure to prevent harassment," "[t]he only conduct that can establish that occurs after July 25, 2019." It further argued that Carreon's instruction "misses liability and focuses only on damages," and also "sort of presupposes that you may

41

award damages and sort of presupposes for the jury that they're going to find sexual harassment occurred, rather than our version which makes it more neutral." Carreon disagreed, contending that his instruction stated that the jury "can only award damages for harassment that actually occurred after July 25th" and, moreover, the first question of the verdict form required the jury to decide if harassment occurred as a threshold matter.[8]

The trial court agreed with Carreon that his instruction was not "prejudging liability," pointing to its inclusion of the phrase "if any." US Foods responded that "'if any' feels buried." It further argued that Carreon's instruction "muddies the verdict form" by putting the failure to prevent harassment "before the concept of the actual – alleged harassing conduct." The trial court rejected these contentions and instructed the jury with Carreon's instruction.

### 2. Jury Question

During deliberations, the jury asked the court, "May we consider all evidence prior to July 25, 2019 in determining Section 1 #3?" The court noted that the query appeared to refer to "section 1, number 3 in the joint verdict form and that question reads, 'Would a reasonable man in Hector Carreon's circumstances consider the work environment to be hostile[,] intimidating, offensive, oppressive or abusive?'"

Carreon responded that they could, "because the question is whether or not there was sexual harassment after July 25th and

---

[8]     The first question of the verdict form stated: "Was Hector Carreon subjected to sexually harassing conduct after July 25, 2019?" The form instructed the jury to proceed to the next question if the answer was yes, and to stop and answer no further questions if the answer was no.

42

the history of what preceded it could affect his sensitivity, and whether or not he felt the company was taking reasonable steps to oppose it. And so whether or not a reasonable person would be offended by it would be based, in part, on whether or not they had confidence the company was taking reasonable steps to prevent it. And they'd be more sensitive to it." US Foods disagreed, arguing that the last chance agreement included a full release of claims prior to July 25, 2019 such that "for purposes of this case, it's as if Mr. Carreon only started working at U.S. Foods as of July 25th, 2019."

The trial court reviewed the instruction it had given and answered the jury's question "Yes," over US Foods's objections.

### 3. Motion for New Trial

After the jury returned a verdict in Carreon's favor, US Foods moved for new trial. As relevant here, US Foods reiterated its arguments that the jury had been improperly instructed that it could consider pre-release conduct to determine liability. It contended that "allowing the jury to hear about conduct predating the release – then affirmatively telling the jury they could consider the conduct in determining whether Plaintiff's work environment was hostile – was erroneous as a matter of law" and prejudiced US Foods. In his opposition to the motion, Carreon argued that the instructions correctly advised the jury that it could consider "whether USF repeatedly chose to ignore past harassment, thereby partly causing the harassment in August 2019 – the limited period for which they could award damages." He further asserted that the pre-release conduct was relevant to whether he was offended, an essential element of his claim. US Foods disputed these contentions in its reply.

43

After hearing the motion for new trial, the court denied it in a written ruling. The court concluded that the tried claims accrued on August 29, 2019, and Carreon "could not release Defendant from future claims that had not arisen" prior to July 25, 2019. It further concluded that evidence of pre-July 25, 2019 conduct was relevant "to whether Defendant failed to prevent the August 29, 2019 harassment," and the jury question arose only after the jury already found that sexually harassing conduct occurred after July 25, 2019.

## B.     Legal Standards

We review claims of instructional error de novo. (*Holistic Supplements, LLC. v. Stark* (2021) 61 Cal.App.5th 530, 548 (*Holistic Supplements*).) In doing so, we read the instructions as a whole to determine whether they accurately stated the law. (*Santillan v. Roman Catholic Bishop of Fresno* (2012) 202 Cal.App.4th 708, 723.) If we conclude error occurred, we reverse only where it is "reasonably probable the error affected the verdict." (*Holistic Supplements*, *supra*, 61 Cal.App.5th at p. 548.) Our assessment of prejudice is deferential to the appellant, here US Foods. (*Garrabrants v. Erhart* (2023) 98 Cal.App.5th 486, 496.) That is, "'we must view the evidence in the light most favorable to the losing party' and 'must assume the jury might have believed the evidence upon which the proposed instruction was predicated and might have rendered a verdict in favor of the losing party had a proper instruction been given.'" (*Id.* at pp. 496-497.) We also consider the state of the evidence, the effect of other instructions, counsel's arguments, and any indications by the jury itself that it was misled. (*Holistic Supplements*, *supra*, 61 Cal.App.5th at p. 548.)

44

### C. Analysis

US Foods acknowledges the challenged instruction "accurately told the jury that it could consider [the] pre-July 25, 2019 evidence in determining whether US Foods had failed to prevent harassment." It contends that the error lies in what the instruction did not do: the jury instructions "never clearly specified what the jury could *not* consider" the pre-July 25, 2019 conduct to determine, "namely, whether Carreon had proved sexual harassment. While the instruction informed the jury it must find that 'at least some harassment' occurred after this date, it did not say that this post-July 25, 2019 harassing conduct must satisfy all of the critical elements of a sexual harassment claim." Therefore, US Foods argues, "the instruction tacitly permitted the jury to impose *liability* based on that same conduct." We are not persuaded.

Both the given instruction and US Foods's proposed alternative identically informed the jury that it could "consider all evidence both before and after that date [July 25, 2019], on the issue of whether U.S. Foods failed to take all reasonable steps to prevent harassment from occurring." We decline to read additional tacit meaning into this agreed-upon language. The court expressly instructed the jury with CACI No. 206 that evidence admitted for a limited purpose could be considered "only for the purpose I describe, and not for any other purpose." "Absent some contrary indication in the record, . . .'we presume the jury follows its instructions . . . "and that its verdict reflects the legal limitations those instructions imposed." [citation].'" (*Soto v. BorgWarner Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 200.)

45

US Foods suggests that the jury's question provides the "contrary indication" necessary to undercut this presumption. It also contends that the court's "unequivocal[ ]" answer to the jury's question "allowed the jury to find US Foods liable even if it determined that only the pre-release conduct rose to th[e requisite] level of severity" to support finding harassment. Again, we are not persuaded. The court told the jury it could consider both pre- and post-July 25, 2019 evidence to determine whether a reasonable person in Carreon's circumstances would consider the work environment to be hostile, intimidating, offensive, oppressive, or abusive. As Carreon contends, "the pre-release conduct can put the post-release conduct in context to determine how a reasonable person would view it." Indeed, our Supreme Court explained in *Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 283 that the circumstances relevant to determining the severity or pervasiveness of harassment include the social context of the behavior and the plaintiff's experience thereof.

Moreover, as the trial court recognized, the jury necessarily found that Carreon was "subjected to sexually harassing conduct after July 25, 2019" before reaching the third question on the verdict form. It also answered all the remaining questions on the verdict form without seeking any further clarification about the pre-July 25, 2019 conduct, indicating that it understood and followed the limiting instructions the court provided. As US Foods acknowledges, Carreon's trial counsel "did not actively encourage the jury to consider pre-release evidence in determining whether Carreon proved the other disputed elements of his claim." There is no basis from which to conclude

46

the jury impermissibly predicated liability or other impermissible findings solely on pre-July 25, 2019 conduct.

US Foods nevertheless asserts that the jury's 11-1 vote on the third question "likely would have gone the other way had the jury been properly instructed," because the jury "could well have found that while Torres' actions on August 29, 2019 were harassing, this conduct was not itself severe and pervasive, did not create an objectively hostile or abusive work environment, and was not perceived by Carreon to do so." It also asserts the "evidence regarding the nature of the pre-release conduct," particularly "Herandez's extreme misconduct" of allegedly grabbing Carreon's genitals in 2018, was "less equivocal" than the evidence of the August 29, 2019 incident.

Even when the evidence is construed in US Foods's favor, these speculative assertions do not support the conclusion that US Foods would have obtained a more favorable verdict had the court used US Foods's instruction or answered the jury's question differently. The verdict form question at issue concerned whether a reasonable person would have perceived the work environment to be hostile, not whether Carreon subjectively did. Although the context of the August 29, 2019 incident was hotly contested, the content of the incident was captured on video and cannot rationally be construed as anything but objectively severe and hostile. For all of these reasons, we find no reversible error based on the contested jury instructions.

## III.   JNOV on Punitive Damages

In his cross-appeal from the amended judgment, Carreon contends the trial court erred by granting US Foods's motion for JNOV on the issue of punitive damages and striking the jury's $1 million award. He argues that although it properly instructed

47

the jury on the issue, the trial court "applied the wrong test to analyze the evidence."  He further argues that substantial evidence supports the conclusion that "several managers" at US Foods—Ramirez, Starke, Padilla, Jimenez, and McInnis—were "managing agents" who either acted with malice, oppression, or fraud or ratified Torres's misconduct as those terms are defined in Civil Code section 3294, subdivision (b).

We conclude that the trial court applied the proper standard and correctly found there was no substantial evidence that Ramirez and Starke were "managing agents."  To the extent the jury may have been able to conclude that Padilla, Jimenez, and McInnis were managing agents, we find no evidence, let alone clear and convincing evidence, that they ratified Torres's conduct or acted with the requisite malice, oppression, or fraud. We accordingly affirm the court's JNOV ruling striking the punitive damages award.  In light of this ruling, we need not consider US Foods's argument that the punitive damages award was unconstitutionally excessive.

### A.    Legal Standards

"A motion for [JNOV] may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.)  The standard of review on appeal is the same: "whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion." (*Ibid.*)  When a factual finding requires proof by clear and convincing evidence, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was

48

true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011; see also *King v. U.S. Nat'l Bank Assn.* (2020) 53 Cal.App.5th 675, 711 [applying *Conservatorship of O.B.* in punitive damages context].) Any legal determinations underlying the trial court's ruling are reviewed de novo. ( See *Sweatman v. Department of Veterans Affairs*, *supra*, 25 Cal.4th at p. 68.)

In certain circumstances, punitive damages may be awarded in addition to compensatory damages "for the sake of example and by way of punishing the defendant." (Civ. Code, § 3294, subd. (a).) They may be awarded only where a plaintiff proves "by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." (*Ibid.*) Where the defendant is an employer, it may only be liable for punitive damages based on the conduct of an employee if it "had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice." (Civ. Code, § 3294, subd. (b).) "Malice" is defined as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (*Id.* § 3294, subd. (c)(1)). "Oppression" is "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (*Id.* § 3294, subd. (c)(2).) "Fraud" is "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." ( *Id.* § 3294, subd. (c)(3).)

"For purposes of determining an employer's liability for punitive damages, ratification generally occurs where, under the particular circumstances, the employer demonstrates an intent to adopt or approve oppressive, fraudulent, or malicious behavior by an employee in the performance of his job duties." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 726.) "Corporate ratification in the punitive damages context requires actual knowledge of the conduct and its outrageous nature." (*Ibid.*)

"With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." (*Ibid.*) By "limiting the class of employees whose exercise of discretion could result in a corporate employer's liability for punitive damages," the Legislature intended "to avoid imposing punitive damages on employers who were merely negligent or reckless and to distinguish ordinary respondeat superior liability from corporate liability for punitive damages." (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 573 (*White*).) Accordingly, our Supreme Court has clarified that a "managing agent" must "be more than a mere supervisory employee." (*Id.* at p. 573.) Classification as a managing agent does "not depend on employees' managerial level, but on the extent to which they exercise substantial discretionary authority over decisions that ultimately determine corporate policy. Thus, supervisors who have broad discretionary powers and exercise substantial discretionary authority in the corporation could be managing agents. Conversely, supervisors who have no discretionary authority over decisions that ultimately determine corporate

policy would not be considered managing agents even though they may have the ability to hire or fire other employees." (*Id.* at pp. 576-577.) Thus, "a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business." ( *Id.* at p. 577.)

The scope of a corporate employee's discretion and authority is a question of fact. (*White*, *supra*, 21 Cal.4th at p. 567.) However, "it is important to keep in mind that a corporate defendant cannot be punished for harassment merely because one of its employees has harassed another employee in the workplace; rather, the focus of the punitive damages inquiry must be on the corporation's individual responsibility, if any, for that harassment." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 714 (*Roby*).) Indeed, the Supreme Court reiterated in *Roby* that when "we spoke in *White* about persons having 'discretionary authority over . . . corporate policy' [citation], we were referring to formal policies that affect a substantial portion of the company and that are the type likely to come to the attention of corporate leadership." (*Id.* at pp. 714-715.) "It is this sort of broad authority that justifies punishing an entire company for an otherwise isolated act of oppression, fraud, or malice." (*Id.* at p. 715.)

### B. Analysis

Carreon first contends the trial court applied the wrong legal standard because it "focused solely on the lack of a 'formal' corporate policy without regard to the substantial evidence of the employees' unfettered discretion that led to a *de facto* policy." He asserts that the court "replaced the breadth of analysis required to determine if an employee is a managing agent with a simple

51

question of whether it was a 'formal' policy and thus disregarding all other evidence." We disagree with this mischaracterization of the trial court's analysis.

In its written ruling, the trial court relied on *White* and *Roby*. Carreon does not dispute that *White* remains a "seminal case" on the issue of punitive damages. (*Colucci v. T-Mobile USA, Inc.* (2020) 48 Cal.App.5th 442, 451 (*Colucci*).) Citing and quoting *Colucci* at length, he fixates on the trial court's quotation of *Roby*'s language on "formal policies" and argues that the Supreme Court in *Roby* did not "intend[ ] to modify or limit *White*'s careful formulation of the managing agent test." (*Colucci, supra*, 48 Cal.App.5th at p. 453.) We find no error in the trial court's citation of *Roby*. In *Roby*, the Supreme Court expressly clarified its holding in *White*. Although the language was dicta, "[d]icta of the Supreme Court should not be disregarded by an intermediate court without a compelling reason." (*Mendoza v. Easton Gas Co.* (1988) 197 Cal.App.3d 781, 788.) No compelling reason is present here.

Carreon makes a related contention about the instruction the court gave the jury on punitive damages, CACI No. 3496. He asserts, correctly, that the instruction "tracks the language of *White*" and does not include the term "formal policy" in its definition of "managing agent."[9] Therefore, citing *Mazik v. GEICO General Insurance Co.* (2019) 35 Cal.App.5th 455, 464-466, he claims that because neither side argued and the trial

---

[9] The relevant portion of the instruction states, "An employee is a 'managing agent' if the person exercises substantial independent authority and judgment in the person's corporate decisionmaking such that the person's decisions ultimately determine corporate policy." (CACI No. 3946)

court did not find error in this instruction, "it was error for the Court to ignore the substantial evidence that showed a *de facto* corporate policy simply by reference to the term 'formal' in *Roby*."

We disagree. In *Mazik*, the court applied the unremarkable proposition that "'We review the sufficiency of the evidence to support a verdict under the law stated in the instructions given, rather than under some other law on which the jury was not instructed.'" (*Mazik v. GEICO Insurance Co.*, *supra*, 35 Cal.App.5th at p. 465.) There, however, substantial evidence supported a finding that the corporate employee at issue was a managing agent because he supervised over 100 claims adjusters, had discretion to approve those adjusters' settlements up to approximately $50,000, and testified that his duties included "establish[ing] settlement standards within the region" he oversaw. (*Id.* at pp. 465-466.) Such evidence is largely absent here.

Carreon asserts there was evidence that Ramirez, Starke, Jimenez, and Padilla all supervised at least 60 employees,[10] and argues that "[w]hether a manager over a few dozen employees in a large corporation is a managing agent is a fact-intensive determination that cannot be resolved on summary judgment or JNOV." Indeed, as explained in *White*, *supra*, 21 Cal.4th at pp. 567, 575, whether a person is a managing agent is a factual question, and "mere supervisory status" does not give rise to "managing agent status." The ultimate question is the whether

---

[10]    Carreon does not make any assertions about the number of employees supervised by "Michael McInnes [*sic*], the Director of Labor Relations." Jerry McInnis did not testify at trial, and, as discussed below, evidence concerning his role at US Foods was sparse.

the supervisor "exercised substantial discretionary authority over significant aspects of a corporation's business." (*Id.* at p. 577.) We turn to that question now, and also consider evidence of malice, oppression, fraud, and ratification where relevant.

### a. Ramirez and Starke

Carreon contends Ramirez and Starke were managing agents because the evidence showed that the warehouse they oversaw was US Foods's largest in Southern California and they testified they were responsible for enforcing US Foods's sexual harassment policies. Carreon contends that Ramirez and Starke violated those policies by failing to appropriately investigate and remediate his repeated, pre-incident complaints about sexual harassment in the freezer, and by failing to investigate the August 29, 2019 incident. Therefore, he asserts, they exercised "the kind of unfettered discretion that creates a corporate policy allowing sexual harassment in the workplace."[11]

An employee who exercises discretionary authority that "necessarily results in the ad hoc formulation of policy" may be found to be a managing agent. (*Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 823; see also *King v. U.S. National Bank Association* (2020) 53 Cal.App.5th 675, 714.) Justice Mosk explained in his concurring opinion in *White*, *supra*, 21 Cal.4th at p. 583, that "in no event should a corporation be permitted to shield itself from liability by the expedient of having a pro forma

---

[11] He also contends that the trial court improperly resolved factual questions against him by finding that he "never complained to Starke that he had been a victim of sexual harassment." Although Carreon is correct, the court made this factual finding in connection with its discussion of ratification, which is a different inquiry.

official policy—issued by high-level management—while conferring broad discretion in lower-level employees to implement company policy in a discriminatory or otherwise culpable manner." However, Carreon stretches this reasonable principle too far. The logical endpoint of his argument is that any supervisor who violates corporate policy thereby creates a contrary, ad hoc company policy and can subject the employer to punitive damages. Such a conclusion is at odds with *White, supra,* 21 Cal.4th at p. 575, which rejected an "overly broad interpretation of the term 'managing agent'" and a standard that would render "corporate employers [ ] liable for punitive damages in most cases."

Carreon has not pointed to any substantial evidence that US Foods conferred broad discretion to implement its policies on either Ramirez or Starke, both low-level managers in the US Foods hierarchy. The evidence at trial showed that Ramirez did not even have the ability to view the surveillance footage of the incident after an employee (not Carreon) reported the incident him; he had to wait five hours for his supervisor, Starke, to arrive.[12] It also showed that once Ramirez and Starke viewed the video, Starke immediately forwarded it Amaro and Jimenez and separately reported the incident to US Foods's incident hotline. Starke also attempted to interview Barragan and Montes, the other employees present during the incident, and tried to get the

---

[12] Ramirez testified on direct examination that around 11:15 p.m. on August 29, an employee told him that he should look at the video from aisle 73, and he remained in the warehouse until approximately 6:00 a.m. on August 30 to do so. On redirect, he agreed that he reviewed the video "that night." We are not persuaded by Carreon's assertion that this testimony is inconsistent or casts doubt on Ramirez's credibility as a witness.

cell phone video, but was not successful. Carreon suggests these efforts were deficient, but deficient investigation does not establish an ad hoc policy or otherwise confer managing agent status. He also points to testimony that "corporate" never advised either Ramirez or Starke that they handled the situation inconsistently with US Foods's policies, but that does not shed light on the scope of Ramirez's or Starke's authority or indicate that they had discretion to guide or implement corporate policy.

### b. Padilla

Padilla was US Foods's "area HR business partner for southern California" at the time of the incident. He testified that he "had oversight for the HR function" for three warehouses, including the La Mirada facility, and supervised four lower-level HR employees. Padilla testified that he worked on "every piece" of "an employee's life cycle . . . from hiring, onboarding, training, employee relations, performance management, all the way through the processes and working with our partners in corporate HR, payroll benefits, things of those natures."

Carreon suggests that a jury could conclude from this evidence that Padilla was a managing agent, because he had "unfettered discretion to allow this videoed sexual harassment to go uninvestigated and to instead terminate the victim for 'workplace violence.'" However, this evidence shows only that Padilla was tasked with enforcing various policies. There is no indication in the record that Padilla crafted policy, interpreted policy, or had discretion to deviate from policy. (See *Kelly-Zurian v. Wohl Shoe Co.* (1994) 22 Cal.App.4th 421-422, cited with approval in *White, supra*, 21 Cal.4th at pp. 573-575.) Moreover, the record shows that he was on vacation at the time of the August 29, 2019 incident and did not return to the office until

56

September 10, 2019, two days before the grievance meeting. It is therefore unclear how the jury could conclude that he exercised any discretion in interpreting or shaping policy or activities surrounding the investigation.

Even if it could, however, there is no evidence from which it could find ratification or despicable intent as to Padilla. There is no evidence that Padilla, Jimenez, or McInnis knew of Carreon's pre-incident complaints. Accordingly, none of them could have ratified Torres's conduct by failing to investigate or remediate the prior complaints, and it is undisputed that Torres was promptly fired after the August 29, 2019 incident.

Carreon asserts that Padilla evinced malicious intent because he "had no knowledge of any investigation into the August 29, 2019 incident," "did not attempt to look at video from any other video [*sic*] to identify similar incidents," and did not do anything in response to Torres's comment at the grievance hearing that "'Everyone is fucking around, we got caught.'"

Padilla was on vacation when the incident and initial investigation occurred, and there is no evidence he was aware of what was happening at US Foods at the time. Carreon does not explain how Padilla's failure to preemptively seek out evidence of other incidents demonstrates malice, fraud, or oppression, and we are not persuaded it does. There was no evidence to support the award of punitive damages due to Padilla's conduct.

  **c.** **Jimenez**

Jimenez testified at trial that he was Vice President of Operations, a position he characterized as "sort of the business brand ambassador." His duties included making sure "that the operational side of the operation is profitable, as well as provid[ing] a safe work environment for the associates." He

viewed the video of the August 29, 2019 incident and made the decision to terminate Carreon for violating the workplace violence policy after the grievance meeting. Jimenez testified that Carreon never said anything about sexual harassment, and "if he had, I think the investigation would have took [*sic*] a different turn."

Carreon asserts that this constellation of facts shows that Jimenez "had sufficient discretion to establish *de facto* corporate policy to largely ignore evidence of sexual harassment and terminate the victim." None of this evidence speaks to Jimenez's discretion, clarifies his responsibilities, or indicates the scope of his oversight. Moreover, Jimenez expressly testified that he did not write either the sexual harassment or workplace violence policies, did not have authority to deviate from them or other corporate policies, and had no authority generally to change or write policy. His ability to fire Carreon cannot alone support the conclusion that he was a managing agent.

However, even if the jury were to find that Jimenez was a managing agent, the record contains no evidence that he acted with malice, oppression, or fraud. The only evidence Carreon identifies in this regard is Jimenez's testimony that he did not investigate the incident as one of sexual harassment because Carreon did not identify it as such, and Jimenez's failure to investigate employee cell phone videos of other incidents. This evidence may show poor judgment, but does not clearly and convincingly demonstrate that punitive damages are warranted. (See *Lackner v. North* (2006) 135 Cal.App.4th 1188, 1212 ["punitive damages awards have been reversed where the defendant's conduct was merely in bad faith and overzealous"].)

### d.    McInnis

Very little evidence regarding McInnis or his role at US Foods was adduced at trial. Padilla testified that McInnis was "the Director of Labor Relations," which he understood to mean that McInnis was a "corporate partner to work with the unions specifically, whether it's through contract negotiations, grievances, anything union related." Jimenez also testified that McInnis was the Director of Labor Relations, and that he "advised us it would be best if we did a stand-down meeting with our associates" after Carreon and Torres were terminated.[13] An email admitted into evidence stated that Zavala had been "advised that Jerry McInnes [*sic*] viewed the video footage and determined there was enough evidence to support termination" before the grievance meeting occurred.

Carreon argues that this evidence "tends to confirm he had discretion to determine whether and how to enforce policies." Such discretion may be sufficient to support a jury finding that McInnis was a managing agent. (See, e.g., *Colucci v. T-Mobile USA, Inc.*, *supra*, 48 Cal.App.5th at p. 454.) However, Carreon does not even mention McInnis in his discussion of malice, oppression, and fraud. The minimal evidence in the record regarding McInnis cannot support the conclusion that he acted with requisite mental state to warrant punitive damages.

---

[13]    Ramirez testified that he conducted the meeting, at which he distributed copies of the memo packet and reminded his subordinates about the zero-tolerance policies regarding sexual harassment and workplace violence.

## IV.  Attorney Fees

Finally, the parties cross-appeal from the order awarding Carreon attorney fees.  US Foods argues that if we reverse the judgment, "which was predicated on Carreon's success in obtaining that judgment," we should also vacate and remand the trial court's award of fees.  Carreon contends the fee award should be reversed because the court abused its discretion in determining his counsel's reasonable hourly rate; using that reduced rate to calculate a reduced lodestar; further reducing the lodestar by 40 percent due to his limited success, unreasonable time expenditures, and block billing; and by refusing to award the requested (or any) multiplier.  We affirm the order.

### A.  Additional Background

In his motion for attorney fees, Carreon requested a lodestar amount of $646,098.60.  That figure included 1,230.34 hours of work billed by four attorneys and five legal assistants.  Carreon's lead attorney, Geoffrey Lyon, billed over half the total hours (685.65) and sought an hourly rate of $850.[14]  In support of Lyon's requested rate, Carreon submitted Lyon's declaration attesting to the certifications and accolades he had achieved during his more than 30 years in litigation practice.  He also submitted several trial court orders awarding Lyon $750 per hour; these orders were issued between 2019 and 2022.  Carreon additionally provided orders awarding other "experienced employment law attorneys" practicing in Los Angeles and San Bernardino Counties hourly fees "of $750 and above."  To support the number of hours billed, Carreon submitted tabular "time sheets" for each person who billed time on the case.  The time

---

[14]    The other, more junior attorneys' hourly rates ranged from $350 to $550. The legal assistants all billed $90 per hour.

sheets included dates worked, hours worked, and descriptions of work performed.

Carreon also requested that the trial court apply a 2.0 multiplier, for a total fee award of $1,292,197.20. He argued that the multiplier was "necessary" to "compensate for the contingent risk" of the case, which required counsel to "turn away definite and promptly paid hourly work" during the three years the case was litigated. Carreon, who filed the motion prior to entry of the amended judgment striking punitive damages, also argued that he obtained an "exceptional" result "over 15 times greater" than US Foods's Code of Civil Procedure section 998 offer "[t]hrough tenacious discovery and cross-examination at trial." US Foods opposed the motion, which the court heard and granted in part on May 9, 2023.

In a 15-page minute order, seven pages of which were devoted exclusively to the fee motion, the trial court concluded that a fee award of $346,520.16 was reasonable. The court determined that the requested amount was unreasonably high, due to both an "unreasonable and unsupported" hourly fee for Lyon and an "excessive and unreasonable" amount of billed time. The trial court found that $750 was a reasonable hourly rate for Lyon and recalculated the lodestar using that figure, generating an "adjusted base" of $577,533.60.

The court then identified "at least four reasons" why the hours billed were unreasonable and excessive. First, it found that Carreon achieved only a limited degree of success by prevailing on two of the 10 claims asserted in his complaint. It further found that all the claims involved a "common core of facts," making it "difficult to divide the attorney hours on a claim-by-claim basis." Second, it found that the time sheets "show

61

duplicative and excessive work," particularly in connection with the summary judgment opposition, which accounted for approximately 190 billed hours. Third, the court found that the time sheets "contain block-billed and vague entries." It highlighted as examples five entries totaling 12.8 hours, and found that "[t]hese and other block-billed and vague time entries do not allow the Court to determine that all of the billed time was reasonable." Fourth, the court found that counsel "improperly billed for administrative tasks and travel time," and identified "just a few of many examples." The court also noted that counsel collectively billed approximately 15 hours to prepare and revise time sheets, which it found "puzzling because Plaintiff's Counsel attested that the entries are accurately recorded at the time of entry." The court further found it was "unreasonable" for counsel "with the highest billing rate" to perform administrative and clerical tasks, and noted that Carreon conceded in his reply that Lyon's billing should be reduced by $9,804 for this reason.

In light of "the type of case, complexity of the case, relatedness of the Plaintiff's claims, the Plaintiff's degree of success, length of litigation, billing records, and the record as a whole," the court concluded "that a reasonable amount of attorney fees is $346,520.16, a 40% reduction from the adjusted base of $577,533.60." The court also declined to award a multiplier, given "the totality of this litigation." It found that the large amount of time spent was "compensated through the actual billing records and number of hours," and reiterated that it struck the $1 million punitive damages award.

B. **Legal Standards**

In a FEHA case, the trial court, "in its discretion, may award to the prevailing party" "reasonable attorney's fees and

62

costs" (Gov. Code, § 12965, subd. (c)(6).)  The trial court found, and the parties do not dispute, that Carreon was the prevailing party at trial and therefore was entitled to recover reasonable fees under this provision.  "This statute has been interpreted to mean that in a FEHA action a trial court should ordinarily award attorney fees to a prevailing party unless special circumstances would render a fee award unjust."  (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 976 (*Chavez*).)  "'A fee request that appears unreasonably inflated is a special circumstance permitting the trial court to reduce the award or deny one altogether.'"  (*Id.* at p. 990.)

Trial courts use the lodestar method to compute FEHA attorney fee awards.  (*Chavez, supra*, 47 Cal.4th at p. 985.)  "Using that method, the trial court first determines a touchstone or lodestar figure based on a careful compilation of the time spent by, and the reasonable hourly compensation for, each attorney, and the resulting dollar amount is then adjusted upward or downward by taking various relevant factors into account."  (*Ibid.*)  Those factors include "(1) the novelty of and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award."  (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 (*Ketchum*).)  The purpose of the adjustments is to "fix a fee at the fair market value for the particular action."  (*Ibid.*)  "In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services."  (*Ibid.*)

63

In making that determination, the trial court must perform at least some analysis; it may not merely "rubberstamp" a request for fees. (*Snoeck v. ExakTime Innovations, Inc.* (2023) 96 Cal.App.5th 908, 921 (*Snoeck*).) However, it is not required to issue a statement of decision (*Ketchum*, *supra*, 24 Cal.4th at p. 1140) or make specific findings as to every charge (*Snoeck*, *supra*, 96 Cal.App.5th at p. 921) . "'A reduced award may be fully justified by a general observation that an attorney overlitigated a case.'" (*Ibid.*, quoting *Karton v. Ari Design & Construction, Inc.* (2021) 61 Cal.App.5th 734, 744.) The trial court accordingly may make an across-the-board percentage cut to the lodestar figure, though it must "'clearly explain its reasons for choosing the *particular* negative multiplier that it chose.'" (*Snoeck*, *supra*, at p. 921 quoting *Warren v. Kia Motors America, Inc.* (2018) 30 Cal.App.5th 24, 41.)

We review attorney fee orders for abuse of discretion. (*Snoeck*, *supra*, 96 Cal.App.5th at p. 921.) "The '"experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong."'" (*Ketchum*, *supra*, 24 Cal.4th at p. 1132.) We presume the trial court considered all relevant factors when making its award, even if they are not expressly discussed in the written ruling. (*Snoeck*, *supra*, 96 Cal.App.5th at p. 921.) The party seeking fees bears the burden of proving the fees it seeks are reasonable. (*Vines v. O'Reilly Auto Enterprises, LLC* (2022) 74 Cal.App.5th 174, 184.)

### C.    Analysis

#### 1.    Calculation and Reduction of Lodestar

Citing only federal case law, most of which is unpublished, Carreon first contends the trial court abused its discretion by reducing Lyon's hourly fee from $850 to $750.  He argues that the court erred by relying "solely on previous orders awarding Lyon $750 per hour," rather than taking into account his evidence showing "the prevailing rate for an attorney of his skill within the relevant legal community."  He also points to Lyon's 35 years of experience and credentials including board certification, specialization, and several top-50 verdicts.

Carreon has not shown that the trial court abused its discretion in determining Lyon's fee.  The reasonable hourly rate used to calculate the lodestar is the prevailing rate in the community for similar work.  (*Syers Properties III, Inc. v. Rankin* (2014) 226 Cal.App.4th 691, 702; see also *Ketchum*, *supra*, 24 Cal.4th at p. 1132.)  The court's choice to afford great weight to Lyon's recent fee awards for similar work accordingly was not an abuse of its discretion. Carreon suggests the trial court failed to consider the orders awarding fees to other employment law attorneys because it did not specifically cite them in its ruling, but, as US Foods pointed out during the hearing before the trial court, Carreon did "not dispute the 100 per hour reduction" or bring any omission to the trial court's attention.  Moreover, the trial court is permitted to rely on its own experience and familiarity with the legal market (*569 East Country Boulevard, LLC v. Backcountry Against the Dump, Inc.* (2016) 6 Cal.App.5th 426, 437), and is not required to enumerate every factor it considers.

Carreon next contends that the trial court abused its discretion by reducing the requested amount by 40 percent. He argues that the trial court failed to properly analyze his degree of success in light of the relatedness of his claims, and further erred by imposing an across-the-board percentage reduction without making specific findings about block-billed and duplicative entries. We disagree.

The extent of a prevailing party's success is an important factor in determining the amount of attorney fees. (*Vines v. O'Reilly Auto Enterprises, LLC*, *supra*, 74 Cal.App.5th at pp. 182-183.) "Where a prevailing plaintiff succeeded on only some claims, the court should make a two-part inquiry: 'First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?'" (*Id.* at p. 183.) Where the plaintiff's successful and unsuccessful claims are related to one another, "the attorney fee amount awarded for a plaintiff who has obtained 'substantial relief' should not be reduced merely for the reason the plaintiff did not succeed on each contention raised." (*Ibid.*) Reduction of the award nevertheless is appropriate where the plaintiff achieves only limited success. (*Chavez*, *supra*, 47 Cal.4th at p. 989.)

The trial court expressly recognized these principles and authorities. It also found that Carreon's claims "did involve a common core of facts," such that it was "difficult to divide the attorney hours on a claim-by-claim basis." The court accordingly "focus[ed] on the significance of the Plaintiff's relief as compared to the hours expended on the litigation," and weighed his "limited success on two of ten causes of action" against his recovery of

66

"more than half of the $300,000.00 sought for emotional distress damages." Its ultimate decision to "apply a slight deduction to account for the Plaintiff's degree of success in this action as a whole" was not a misapplication of the governing law or an abuse of its discretion.

Carreon contends the court should have made more specific findings regarding the reasonableness of the time spent. However, the court undertook that analysis in a different portion of its order, in which it concluded that Carreon's counsel spent an unreasonable amount of time on the unsuccessful opposition to summary judgment in particular. The court was not required to make additional findings in multiple parts of its order. There is also no indication that it "punish[ed]" Carreon for mitigating his economic damages by quickly securing new employment. It acknowledged that he "did not—and could not—recover compensatory damages for lost wages" in its discussion of his degree of success, but also recognized that he recovered more than half of his requested emotional damages.

Carreon also argues that more specific findings regarding block-billing and duplicative work were necessary to support the 40 percent reduction. The question of what degree of scrutiny is warranted when a trial court makes across-the-board cuts to fees is currently pending before our Supreme Court. (See *Cash v. County of Los Angeles* (2025) 111 Cal.App.5th 741, review granted, July 9, 2025, No. S291827.) However, even those courts holding that the trial court must "'clearly explain its reasons for choosing the *particular* negative multiplier that it chose'" have afforded trial courts "'considerable deference'" and applied the abuse of discretion standard. (*Snoeck*, *supra*, 96 Cal.App.5th at p. 921; compare with *Cash v. County of Los Angeles*, *supra*, 111

Cal.App.5th at pp. 747-749 [rejecting *Snoeck* as misapplying federal standard].)  For instance, in *Snoeck*, the Court of Appeal affirmed the trial court's application of a 0.4 multiplier due to counsel's incivility because it found that the trial court appropriately considered "relevant case-specific factors" and its award did not shock the conscience.  (*Snoeck, supra,* 96 Cal.App.5th at pp. 930, 930-933.)

We take a similar approach here.  Assuming without deciding that the trial court was required to support its across-the-board reduction with particularized findings, we conclude that the ruling was properly supported. As summarized above, the court explained in some detail "at least four reasons" why the time spent on the case was unreasonable and excessive.  Among those reasons were the block-billing and duplicative work findings Carreon challenges.

"'Trial courts retain discretion to penalize block billing when the practice prevents them from discerning which tasks are compensable and which are not.'"  (*Baer v. Tedder* (2025) 115 Cal.App.5th 1139, 1162.)  The trial court identified as examples several vague and block-billed entries in its order.  Relying exclusively on federal case law, which is not binding on this court (*People v. Bradley* (1969) 1 Cal.3d 80, 86 ["we are not bound by the decisions of the lower federal courts even on federal questions"]), Carreon argues that the court only should have reduced the block-billed hours rather than applying "the 40% reduction . . . to all the hundreds of time entries."  This argument ignores that block-billing was only one of the several bases the court cited in support of the across-the-board reduction.  It also fails to address the court's citation of *Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1325 for the proposition

68

that "vague, blockbilled time entries inflated with noncompensable hours destroy an attorney's credibility." As that decision recognized, "[a]n attorney's chief asset in submitting a fee request is his or her credibility, and where vague, blockbilled time entries inflated with noncompensable hours destroy an attorney's credibility with the trial court, we have no power on appeal to restore it." (*Id.* at pp. 1325-1326.)

The trial court also looked askance at, and factored into its reduction, counsel's improper billing for travel and administrative tasks, billing partner rates for clerical work, and duplicative work. "'[P]adding' in the form of inefficient or duplicative efforts is not subject to compensation" (*Ketchum*, *supra*, 24 Cal.4th at p. 1132), and a trial court is "justified in reducing a claim if it believes the billing is unjustly inflated." (*Save Our Uniquely Rural Community Environment v. County of San Bernardino* (2015) 235 Cal.App.4th 1179, 1186.) The court relied on numerous considerations when reducing the requested amount by a flat percentage; it did not, as Carreon suggests, use "one example to justify a wholesale reduction of the multiplier, even though most time entries were unchallenged."

### 2. Denial of Multiplier

Carreon also argues that the court abused its discretion by "refusing to award any multiplier" to account for the contingent nature of the case. He contends that the Supreme Court's analysis in *Ketchum*, *supra*, 24 Cal.4th at pp. 1132-1133, "made clear that unless a multiplier is used, a contingency attorney can never be fairly compensated (compared to his or her hourly-fee counterpart) given the great risk of no payment and the certainty that even if payment is received, it will be long-delayed." Though he acknowledges that *Ketchum* expressly stated that the trial

69

court is not required to use a multiplier (*id.* at p. 1138), Carreon further asserts that "by the logic of the decision, a positive multiplier must be the norm" to ensure that counsel who work on contingency are fairly compensated. He emphasizes that he "does not argue for a *mandatory* multiplier," only that there is "an expectation for a trial court to award a multiplier in a FEHA contingency-fee case, unless there is a legitimate reason for denial, such as another factor disfavoring a party." We do not read *Ketchum* so broadly, and we do not find an abuse of discretion here.

In *Ketchum*, *supra*, 24 Cal.4th at p. 1132, the Supreme Court identified "the contingent nature of the fee award" as one of at least four factors relevant to lodestar adjustment. It further recognized that contingent fee contracts "may properly provide for a larger compensation than would otherwise be reasonable," and observed that enhancing the lodestar where the fee is contingent can "bring the financial incentives for attorneys…into line with incentives they have to undertake claims for which they are paid on a fee-for-service basis." (*Ibid.*) However, as Carreon acknowledged, it explicitly clarified that "the trial court is not *required* to include a fee enhancement to the basic lodestar figure for contingent risk, exceptional skill, or other factors, although it retains discretion to do so in the appropriate case." (*Id.* at p. 1138, italics in original.) *Ketchum* also recognized that the relevant market may compensate for contingency risk (*ibid.*), which may be a factor in FEHA cases because "the availability of statutory fees" makes the "possibility of receiving full compensation for litigating the case . . . greater than that inherent in most contingency fee actions." (*Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1174.) Ultimately, "the

70

party seeking a fee enhancement bears the burden of proof." (*Ketchum*, *supra*, 24 Cal.4th at p. 1138.)

During the hearing on the motion, the court stated that it "did consider the contingent nature of the case, but the court also considered a number of other factors, including the relative success or lack of success thereof." The court also reiterated in its written order that it considered "the totality of this litigation" in finding "that no additional multiplier should be awarded." It also noted that it accounted for the "heavy expenses and protected [*sic*] litigation" in the lodestar and costs award. Carreon has not carried his burden of showing this was an abuse of discretion. He argues that the instant "case is a perfect example of why a positive multiplier is necessary to ensure a fully-compensatory award," because counsel devoted over 1,200 hours to the case but "had to go without any compensation" through the lengthy pendency despite the need to "meet payroll, rent, and overhead." The trial court considered these factors and determined they did not warrant a multiplier in this case; it did not inappropriately refuse to consider them. (See *Greene v. Dillingham* (2002) 101 Cal.App.4th 418, 428.) The disconnect between the court's order and Carreon's expectations does not establish an abuse of discretion.

## DISPOSITION

The judgment and attorney fee order are affirmed.  US Foods may recover its costs of appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS,  ACTING P. J.

We concur:


MORI, J.


TAMZARIAN, J.